*381
 
 CIRILLO, Judge:
 

 A. Richard Nernberg t/d/b/a A.R. Building Company appeals from the judgment entered in the Court of Common Pleas of Allegheny County, granting First Home Savings Bank’s request to enforce its mortgage lien against the entire mortgaged parcel. We affirm.
 

 The facts as stipulated by the parties are as follows: First Home Savings Bank (hereinafter “Bank”) is a savings and loan association organized and existing under the laws of the Commonwealth of Pennsylvania. Bank’s principal place of business is Pittsburgh, Pennsylvania. A. Richard Nernberg resides in the City of Pittsburgh and conducts a real estate, management and development business as a sole proprietorship under the name “A.R. Building Company.”
 

 On December 22, 1986, A. Richard Nernberg and his wife, Susan Nernberg, executed a promissory note payable to Bank in the principal amount of $375,000.00 (“Note”). The Note is a demand note
 
 [1]
 
 with interest payable monthly at the prime rate plus 1.5 percent. Under the terms of the Note, the Nernbergs are personally liable for ten percent of the original principal amount, or $37,500.00.
 

 On December 22, 1986, simultaneous with the execution of the Note, A. Richard Nernberg as “A.R. Building Co.” (hereinafter collectively referred to as “Developer”) granted Bank a first mortgage on Lots 6 through 15 of a townhouse development project named “Baldwin Village.”
 
 [2]
 
 The mortgage was duly recorded in the Recorder of Deeds Office in Allegheny County, Pennsylvania.
 

 On April 3, 1987, Developer wrote to Bank as follows:
 

 
 *382
 
 Dear Mr. Vuono:
 

 We are preparing to construct additional townhouses on the Lots 6 and 7 at the above-captioned development [Baldwin Village]. This will provide for the construction of an additional 13 townhouses.
 

 Would you please furnish a written release figure which would be paid once the townhouses are sold?
 

 Very truly yours,
 

 A. Richard Nernberg,
 

 President
 

 On April 14, 1987, Bank, by its Vice President Robert J. Vuono, replied to Developer’s letter as follows:
 

 Dear Dick,
 

 I am in receipt of your letter of April 3, regarding Baldwin Village. Sorry for the delay in response. Please be advised that we are prepared to release that portion of our mortgage on Lots 6 and 7 upon receipt of $75,000.00 paydown on your existing loan.
 

 I trust this is satisfactory for your needs. If you have any questions, please feel free to call.
 

 Very truly yours,
 

 Robert J. Vuono
 

 Vice President
 

 Mr. Vuono, as Bank’s Vice President in charge of commercial loans, had authority to write the letter of April 14, 1987. Whatever the legal effect of the exchange of the April, 1987 letters between Developer and Bank (hereinafter the “Release Agreement”), both parties agree that Bank is bound by that effect.
 

 ' On April 6,1987, Developer had not yet started construction of Buildings 6 and 7,
 
 [3]
 
 which were to contain six and eight townhouses, respectively.
 
 [4]
 
 Construction of Building 6 started
 
 *383
 
 in June, 1987 and was completed in November, 1987 at a cost of $194,806.00. Construction of Building 7 started in July, 1987 and was completed in November, 1987 at a cost of $291,797.00.
 

 In November of 1987, Developer sold two units in Building 6 (Units “C” and “E”), and Bank released the lien of its mortgage for both units, when paid $15,000.00 ($7,500.00 per unit) by Developer. In May of 1988, Developer sold another unit in Building 6 (Unit “A”). Again, Bank released the lien on its mortgage against Unit “A” when paid $7,500.00 by Developer.
 

 On June 20, 1988, Bank demanded payment of the entire unpaid principal of the $375,000.00 loan, which at that date was $352,500.00 ($375,000.00 minus the $22,500.00 previously paid). At that time, Developer was current in the payment of interest on the Note and was not in the process of constructing any additional townhouses. In fact, Developer has not, since June 20, 1988, begun construction of any additional townhouses in Baldwin Village.
 

 On June 28, 1988, Developer tendered to Bank the sum of $52,500.00, which represented the balance due under the Release Agreement,
 
 [5]
 
 and asked for release of Bank’s mortgage lien on the balance of Lots 6 and 7. Bank rejected the tender.
 

 On June 29, 1988, a closing was held for the sale of two units in Building 6 (Units “B” and “D”). The settlement officer of these closings, acting on behalf of Developer, tendered to Bank the sum of $52,500.00 from the sale of these two units. Bank again rejected the tender of the $52,500.00. Bank indicated, however, that it would release the lien of its first mortgage with respect to Units “B” and “D” on receiving evidence that those units had been under contract of sale prior to June 20, 1988 and in return for a principal paydown of $7,500.00 per townhouse. Bank’s reasoning was that if Units
 
 *384
 
 “B” and “D” had been under contract of sale at the time that Bank demanded payment of the unpaid principal on the Note, then under the doctrine of “equitable conversion,” the “B” and “D” units should be regarded as already sold on the date Bank put Developer into default.
 

 On November 16, 1988, Developer paid $15,000.00 to Bank with respect to the sale of Units “B” and “D” from Budding 6, and Bank released the lien of its mortgage from those two units. Bank accepted this payment based upon the “equitable conversion” theory set forth above, Units “B” and “D” having been under contract of sale as of June 20, 1988.
 

 On February 24, 1989, Developer entered into an “Interim Agreement” with Bank. Basically, Bank would accept the balance of the $75,000.00 principal reduction from the April, 1987 correspondence and would release the lien of its mortgage from Lots 6 and 7, but without prejudice to its contention that after June 20, 1988, it was under no obligation to release the lien of its mortgage from further units on Lots 6 and 7. Accordingly, Developer paid an additional $37,500.00 to Bank, and Bank released its mortgage from the balance of Lots 6 and 7.
 

 Under the “Interim Agreement,” Developer agreed to accept a “conditional” personal liability for the total sale price of townhouses sold after June 20, 1988 up to the outstanding principal balance of the loan should Bank’s position be determined in litigation to be correct. Bank agreed, in turn, that should Developer’s position be accepted, then Bank’s rights would be limited to the ten percent personal liability ($37,-500.00) as set forth in the loan documents and to its mortgage on the balance of the property, Lots 8 through 15.
 

 The “Interim Agreement” did not resolve the controversy between Developer and Bank. It expressly provided that nothing in the agreement shall be taken as modifying or changing the substantive rights of the parties immediately prior to having entered into the “Interim Agreement.” The parties did agree, however, that five units in Building 6 had been released either prior to the June 20, 1988 demand for
 
 *385
 
 payment or under the “equitable conversion” theory. The parties further agreed that nine units remained unsold (one unit in Building 6 and all eight units in Building 7) and that all such sales and lien releases were accomplished under the “Interim Agreement.” The unpaid principal of the loan subject to the “Interim Agreement” is $300,000.00.
 
 [6]
 

 The remaining nine units were sold at the following prices and dates:
 

 [[Image here]]
 

 As a result of Developer’s failure to pay the balance due under the Note, Bank initiated a foreclosure action against Developer. Developer, in turn, filed an action in equity, seeking specific performance as to Bank’s alleged promise in the Release Agreement to release its lien on Lots 6 and 7, following tender of $75,000.00. The two actions were subsequently consolidated and the case proceeded to trial before the Honorable S. Louis Farino. At trial, the principal issues presented were whether, on June 20, 1988, Bank was within its rights to demand full payment under the Note and whether Developer was entitled to defeat a portion of Bank’s demand for payment in full based upon the unexecuted portion of the Release Agreement. Put somewhat more simply, the dispute centered on the determination of the effect of the Release Agreement on the original mortgage/note agreement, and the
 
 *386
 
 determination of whether the Release Agreement was enforceable after Developer defaulted on the Note.
 

 Following trial, Judge Farino found in favor of Bank. In his view, on June 20, 1988, Bank was entirely within its rights to demand payment in full on the Note, and Developer’s subsequent failure to make full payment constituted a default under the Note and mortgage. Judge Farino further found that the Release Agreement did not survive Developer’s default, because the parties did not include in the agreement a provision stating that the arrangement would continue to be in effect following a material default by Developer. Thus, Judge Farino concluded that the Release Agreement was rendered void upon Developer’s default. Post-trial motions were filed and denied and this appeal followed.
 

 On appeal, Developer presents the following issues for our review:
 

 (1) Whether the trial court erred in adopting an interpretation of promissory language by Bank which gave Bank the power by its own unilateral act to nullify and render illusory its promise where Developer had constructed two buildings in reliance on the promise?
 

 (2) Whether Bank, which had permitted Developer to pay a lien release fee in installments as each townhouse was sold, was estopped from abruptly changing its position, without first giving Developer the opportunity to pay the balance of the fee due in a single payment?
 

 Initially, we note that as the trial court made no independent factual findings, but simply relied on the factual stipulation of the parties, our standard of review is
 
 de novo;
 
 that is, we are not bound by the factual or legal conclusions drawn by the trial court.
 
 County of Butler v. Brocker,
 
 455 Pa. 343, 314 A.2d 265 (1974).
 

 Developer first argues that the Release Agreement constituted a binding modification of the original demand note/mortgage agreement. As such, Developer claims that Bank was precluded from demanding full payment under the Note, but was limited to the outstanding balance due minus the $75,-
 
 *387
 
 000.00 figure quoted by Bank in its April 14, 1987 letter. To view this arrangement otherwise, Developer opines, would render Bank’s promise to release the liens on Lots 6 and 7 illusory, as Bank could unilaterally terminate the Release Agreement by a demand for full payment under the Note. Such illusory contractual obligations, Developer contends, fly in the face of the law of contracts of this Commonwealth.
 

 Developer’s argument is based upon the assumption that the Release Agreement was a valid, enforceable contract. To this end, Developer argues that Bank’s offer to release the liens on Lots 6 and 7 in exchange for a principal paydown of $75,000.00 on the Note was supported by Developer’s construction of townhouses on the lots in question. This argument, albeit clever, is without merit.
 

 Contracts are enforceable when the parties reach a mutual agreement, exchange consideration, and have set forth the terms of their bargain with sufficient clarity.
 
 Greene v. Oliver Realty, Inc.,
 
 363 Pa.Super. 534, 526 A.2d 1192 (1987). An agreement is sufficiently definite if it indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy.
 
 Id.
 
 Moreover, when the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document.
 
 Id.
 
 (citing
 
 Mears, Inc. v. National Basic Sensors,
 
 337 Pa.Super. 284, 289, 486 A.2d 1335, 1338 (1984)).
 

 Traditional contract law distinguishes between bilateral and unilateral contracts. Bilateral contracts involve two promises and are created when one party promises to do or forbear from doing something in exchange for a promise from the other party to do or forbear from doing something else.
 
 Id.
 
 Unilateral contracts, in contrast, involve only one promise and are formed when one party makes a promise in exchange for the other party’s act or performance.
 
 Id.
 
 Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance.
 
 Id.
 

 
 *388
 
 In the case at hand, we judge the exchange of letters in April of 1987, not to have created a binding bilateral contract, but to have been an
 
 offer
 
 by Bank to enter into a unilateral contract. Under this arrangement, Bank agreed to release the liens on Lots 6 and 7 in exchange for the Developer’s paydown of $75,000.00 under the Note.
 

 Contrary to Developer’s assertion, we do not deem its construction of townhouses on Lots 6 and 7 to have been a return promise, indicating the formation of an enforceable bilateral contract. Our reading of the April 3 and April 14, 1987 letters does not support Developer’s contention that Bank’s promise to release the liens on Lots 6 and 7 in exchange for $75,000.00 induced Developer to effect construction on those lots. To the contrary, it appears that Developer’s townhouse construction on the lots in question necessitated its communication with Bank, in order for Developer to secure lien releases necessary for the unencumbered sale of the finished residences. Accordingly, we find that Bank’s letter of April 14, 1987 did not create a bilateral contract, but simply was an offer by Bank to enter into a unilateral contract, where acceptance could only be completed by Developer’s payment of $75,000.00.
 

 Having characterized Bank’s letter as an offer to enter into a unilateral contract, we must now determine the effect of Bank’s acceptance of $37,500.00 in exchange for its release of the liens on Units “A” through “E.”
 
 [7]
 
 It is horn-book law that an offer to enter into a unilateral contract lasts for a reasonable period of time unless the offeree’s power of acceptance is terminated.
 
 Vaskie v. West American Ins. Co.,
 
 383 Pa.Super. 76, 81, 556 A.2d 436, 438 (1989); Restatement (Second) of Contracts § 41 (1981). An offeree’s power to accept is so terminated by: (1) a counter-offer by the offeree; (2) a lapse of time; (3) a revocation by. the offeror; or (4)
 
 *389
 
 death or incapacity of either party. Restatement (Second) of Contracts § 36 (1981);
 
 see also Biggins v. Shore,
 
 523 Pa. 148, 565 A.2d 737 (1989) (Papadakos, J., dissenting) (stating that death or incapacity of either party terminates an offer);
 
 Cohen v. Goldberg,
 
 431 Pa. 192, 244 A.2d 763 (1968) (same);
 
 Janson v. Frost,
 
 422 Pa.Super. 36, 618 A.2d 1003 (1993) (holding that the passage of a reasonable time terminates an offer);
 
 Ingrassia Const. Co., Inc. v. Walsh,
 
 337 Pa.Super. 58, 486 A.2d 478 (1984) (holding that a counter-offer terminates the original offer).
 

 A counter-offer is defined as “an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer.” Restatement (Second) of Contracts § 39 (1981). Furthermore, a reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counter-offer, having the effect of terminating the original offer.
 
 Accu-Weather, Inc. v. Thomas Broadcasting Co.,
 
 425 Pa.Super. 335, 339, 625 A.2d 75, 77 (1993);
 
 Hahnemann Med. College & Hosp. v. Hubbard,
 
 267 Pa.Super. 436, 440, 406 A.2d 1120, 1122 (1979); Restatement (Second) of Contracts § 59 (1981).
 

 In the ease at hand, it is readily apparent that Developer’s November, 1987 tender of two $7,500.00 payments to Bank in exchange for Bank’s release of the liens on Units “C” and “E” was not Developer’s acceptance of Bank’s April 14, 1987 offer, but, to the contrary, was Bank’s acceptance of Developer’s counter-offer. Bank’s original offer was to release the liens on all units on Lots 6 and 7 in exchange for a principal paydown of $75,000.00. Instead of accepting this offer through full payment, Developer proposed a new arrangement; that is, Developer offered Bank $7,500.00 per unit in exchange for Bank’s piecemeal release of two townhouses within Lot 6. As Developer’s offer related to the same subject matter as Bank’s in the Release Agreement, but proposed a different payment scheme, Developer proposed a counteroffer, terminating Bank’s original offer.
 
 Accu-Weather, su
 
 
 *390
 

 pra; Hubbard, supra.
 
 This is particularly evident, moreover, given the fact that, under this new unit-by-unit release arrangement, instead of costing Developer $75,000.00 to obtain a complete release for Lots 6 and 7, it would have cost Developer $105,000.00.
 
 [8]
 
 Accordingly, as the Release Agreement was terminated by Developer’s counter-offer, Bank’s demand for the balance of the unpaid principal could not have rendered its promises under the Release Agreement illusory. Thus, Developer’s first argument is meritless.
 

 Developer’s second argument is that Bank’s acceptance of the five $7,500.00 payments under the Release Agreement, equitably estopped Bank from refusing the $37,500.00 balance due under that agreement. We disagree.
 

 In making this claim, Developer once again presupposes that the Release Agreement constituted a valid contract between the parties, as this argument is based upon the fact that Bank accepted five $7,500.00 “installments” under that agreement. As we have already determined that no valid, enforceable contract was created by the Release Agreement, Developer’s argument is without merit.
 

 Notwithstanding the fact that Developer’s underlying assumptions are erroneous, were we to apply the tenets of equitable estoppel to the case at hand, Developer’s argument would still fail. As Developer correctly notes, “the doctrine of equitable estoppel protects the reasonable expectations of one who relies on another’s course of conduct; it prevents a party from taking a position that is inconsistent with a position previously taken which is disadvantageous to the other.”
 
 Doppler v. Doppler,
 
 393 Pa.Super. 600, 608, 574 A.2d 1101, 1105 (1990). In order for the defense of equitable estoppel to apply, a party must adduce sufficient evidence which indicates that: 1) one party induced the other party to act; and 2) there was justifiable reliance as a result of the inducement.
 
 Chester Extended Care Center v. Commonwealth,
 
 526 Pa. 350, 355, 586 A.2d 379, 382 (1990). Further
 
 *391
 
 more, an inducement sufficient to create an equitable estoppel “may consist of words or conduct which intentionally or negligently causes another to believe that a promise has been made or that a particular state of facts exists.”
 
 Havas v. Temple University of Com. Systems of Higher Educ.,
 
 357 Pa.Super. 353, 355, 516 A.2d 17, 19 (1986).
 

 Applying this standard to the case at hand decries Developer’s argument. Bank’s course of conduct neither induced Developer to act, nor caused Developer to justifiably rely on that inducement. To the contrary, Bank merely agreed to a series of five offers made by Developer to release the liens on individual units in exchange for a paydown of $7,500.00 per unit. Moreover, if any party was induced and had cause to justifiably rely on the inducement, it was Bank and not Developer. Bank, after all, made an accommodation to Developer in releasing the liens from any of the units in question and had no way of presupposing that such actions would result in a dispute over the unpaid principal in the Note. Accordingly, Developer’s equitable estoppel argument is also without merit.
 

 Judgment affirmed.
 

 [1]
 

 . A demand note is a "note which expressly states that it is payable on demand, on presentation or at sight; a note in which no time for payment is expressed.” Black’s Law Dictionary 387 (5th ed. 1979). Here, the Note expressly states that it is payable on demand.
 
 See
 
 R.R. at 149a.
 

 [2]
 

 . Bank was not granted a mortgage on Lots 1 through 5 of Baldwin Village, which were, as of December 22, 1986, either already built or in the process of being built.
 

 [3]
 

 . Buildings 6 and 7 were to be constructed on Lots 6 and 7, respectively.
 

 [4]
 

 . There appears to be a discrepancy in the stipulated facts regarding the number of townhouses to be constructed on Lots 6 and 7. In its
 
 *383
 
 April 6, 1987 letter, Developer indicated that 13 units were to be constructed, whereas in Paragraph 10 of the stipulated facts the parties stated that 14 units were to be constructed.
 
 See
 
 R.R. at 134a-135a. By June of 1989, however, Developer had constructed 14 townhouses on Lots 6 and 7.
 

 [5]
 

 . This sum reflects the difference between $75,000.00, the principal paydown figure from the Release Agreement, and the three $7,500.00 payments paid to Bank to release its liens on Units A, C, and E.
 

 [6]
 

 . The $300,000.00 figure is reached by subtracting from the principal of $375,000.00, the $37,500.00 paid for release of the liens on Units A-E and the $37,500.00 paid under the "Interim Agreement.”
 

 [7]
 

 . Specifically, in November, 1987, Bank accepted a principal paydown of $15,000.00 and released its liens on Units "C” and "E.” In May, 1988, Bank accepted another paydown of $7,500.00 and released its lien on Unit "A.” On November 16, 1988, Bank accepted a paydown of $15,000.00 and released its lien on Units "B” and "D.”
 

 [8]
 

 . This $105,000.00 figure is reached by computing the sum of 14 individual $7,500.00 payments by Developer to Bank or one payment for each unit on Lots 6 and 7.