NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2261
_____

LAW OFFICES OF BRUCE J. CHASAN, LLC;
BRUCE J. CHASAN, ESQ.,
                                        Appellants

v.

PIERCE BAINBRIDGE BECK PRICE & HECHT, LLP;
JOHN M. PIERCE, ESQ.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-05399)
District Judge:  Hon. Anita B. Brody
_____

Submitted Under Third Circuit LAR 34.1(a)
November 12, 2019

Before:  JORDAN, SCIRICA, and RENDELL, *Circuit Judges.*

(Filed: November 26, 2019)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Bruce J. Chasan, Esq. and the Law Offices of Bruce J. Chasan, LLC (collectively, "Chasan")[1] claim that attorney John M. Pierce, Esq. and his law firm, Pierce Bainbridge Beck Price & Hecht, LLP ("PBBPH") breached the terms of a settlement agreement pertaining to a former Chasan client. The District Court dismissed Chasan's complaint on the ground that Chasan failed to adequately allege the existence of a binding contract under Pennsylvania law. For the reasons that follow, we will affirm.

I.    **BACKGROUND**[2]

In December 2016, non-party Lenwood Hamilton engaged Chasan to represent him in a lawsuit against various entities for purportedly misappropriating his likeness and voice in a videogame series. Although Chasan accepted the matter on a contingency basis, the terms of his engagement letter with Hamilton provided that if Hamilton terminated the representation, he would be liable in *quantum meruit* to Chasan for the time worked on his case.

In March 2018, to secure funding needed to prosecute Hamilton's misappropriation claims, Chasan arranged for Pierce to meet with him and Hamilton. Approximately one week after that meeting, Hamilton terminated his relationship with Chasan and retained

---

[1] For ease of reference we refer to Chasan and his firm together, in the singular, and as if we were speaking of Chasan personally.

[2] The facts are based upon Chasan's complaint and the attachments thereto, with all reasonable inferences drawn in his favor. *See Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017) ("When considering a Rule 12(b)(6) motion, we 'accept all factual allegations as true, [and] construe the complaint in the light most favorable to the plaintiff[.]'" (citation omitted)).

Pierce and PBBPH to replace Chasan as counsel in the misappropriation case. Chasan promptly notified Pierce and PBBPH (but not Hamilton), that Hamilton owed approximately $320,000 in *quantum meruit* for Chasan's work on Hamilton's behalf. Chasan asked Pierce and PBBPH to pay Hamilton's obligation, and eventually threatened to bring suit against Pierce and PBBPH when that request went unanswered.

Pierce and PBBPH responded by telling Chasan that Hamilton had authorized them to file a malpractice claim against Chasan pertaining to Chasan's work in Hamilton's case. Shortly thereafter, "Pierce initiated settlement negotiations with Chasan," pursuant to which "Pierce proposed terms that he urged be accepted, and the disputants thereafter could provide mutual releases." (App. at 22.)

Over the next four months, Chasan and Pierce exchanged various settlement proposals. On September 10, 2018, Pierce emailed Chasan two "final offers," each explicitly "conditioned upon getting … Hamilton's approval." (App. at 23.) The offer pertinent here contemplated a payment of $160,000 to Chasan, after which "[t]here would be no further payment to [Chasan] of any kind for any reason from our law firm or from [Hamilton], regardless of the outcome" of Hamilton's case.[3] (App. at 23-24.) No mention was made of releases.

Five days later, on September 15, Chasan sent the following response to Pierce:

> We have a settlement. I am accepting your … offer listed below, i.e. the full $160,000 with no further payment by you or your law firm or by … Hamilton, regardless of the outcome of the case.

---

[3] The terms of the second "offer" have no bearing on Chasan's claims, which are predicated specifically on his purported acceptance only of the first "offer."

We should be able to accomplish this speedily. The Mutual Release is simple in concept: In consideration of payment of $160,000, Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan release all claims against John Pierce, the Pierce Bainbridge law firm, and Lenwood Hamilton. Also, you and Pierce Bainbridge, and Lenwood Hamilton release all claims against Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan, Esq.

[Hamilton] should readily accept this, as it reduces his *quantum meruit* liability by at least half.

Do you want to draft the mutual releases? I believe this would be a relatively short document, just a couple of pages. No claims are reserved. I expect we can get it done within a week, and payment can be made promptly. Please advise.

Good luck with the case.

(App. at 24.) Pierce replied to Chasan later that day and directed two of his partners to "work with [Chasan] to wrap this up swiftly." (App. at 25.)

On September 20, Chasan emailed Pierce and two of his partners a draft document titled "Settlement Agreement and Mutual Release." (App. at 25.) The draft contemplated that Hamilton would be a party, and that each of Chasan, Pierce, PBBPH, and Hamilton would give and receive releases. Later that day, and "after a brief review," one of Pierce's partners emailed Chasan "initial comments" on the draft agreement. (App. at 25.) Two days later, Chasan conveyed that he was "okay" with those initial comments. (App. at 26.)

On October 17, 2018, having not received any further communication from Pierce or his partners, Chasan emailed Pierce and his partners a revised draft agreement incorporating the "initial comments" from September 20. Chasan also executed and dated the revised draft, but recognized that Pierce, PBBPH, and Hamilton still needed to approve and sign the document.

4

On October 30, 2018, one of Pierce's partners emailed Chasan a further revised draft of the settlement agreement. The partner informed Chasan that any further changes to the proposed draft would require approval from both Pierce and Hamilton. Chasan replied that the latest iteration of the settlement agreement contained "material modifications" that he "could not accept." (App. at 27.) The unacceptable "material modifications" included eliminating Hamilton's obligation to release any of his claims against Chasan, and removing Hamilton from the scope of the draft agreement's non-disparagement and warranties obligations.

Between October 30, 2018 and November 16, 2018, the parties had "numerous email exchanges and suggestions attempting to bridge the gap regarding Hamilton's unwillingness to sign a release of any malpractice claims he might have" against Chasan. (App. at 29.) On November 8, Pierce's partner sent Chasan a revised draft agreement; however, "this revised draft was still in flux in that it was uncertain whether changes pertaining to a release by Hamilton could or would be finalized." (App. at 29.) On November 16, Chasan replied to Pierce's partner with a further revised draft agreement in which Hamilton was removed as a party. To date, "Pierce and [PBBPH] have not accepted the proposed amended Settlement Agreement that Chasen sent" on November 16. (App. at 31.)

Chasan initiated the present lawsuit against Pierce and PBBPH on December 14, 2018. Although Chasan's complaint acknowledges that neither Pierce nor PBBPH ever signed a settlement agreement, Chasan alleges that the various interactions among Chasan, Pierce, and PBBPH – particularly the email exchange occurring between September 10 and

5

September 15, 2018 – resulted in a binding settlement. According to Chasan, Pierce's and PBBPH's failure to honor the terms of that purportedly binding agreement constitutes a breach of contract for which he is entitled to, among other remedies, specific performance. Pierce and PBBPH moved to dismiss Chasan's complaint in its entirety. After full briefing, the District Court granted the motion to dismiss on the grounds that Chasan had failed to adequately allege the existence of a binding agreement, a necessary element under Pennsylvania law for Chasan's claims.

Chasan timely appealed.

## II.    DISCUSSION[4]

Chasan's appeal can be distilled to a single question: under Pennsylvania law, did the months-long exchanges among Chasan, Pierce, and PBBPH create a binding settlement

---

[4] Chasan alleged that the District Court had diversity jurisdiction over his claims. Therefore, the District Court only had jurisdiction to rule on the merits of Chasan's claims if Chasan, Pierce, and PBBPH were "complete[ly]" diverse. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978). PBBPH's citizenship (or, more likely, its citizenships) is not readily discernable from Chasan's complaint, and it is unclear whether Chasan undertook the requisite investigation to actually attempt to determine PBBPH's citizenship. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 110 (3d Cir. 2015) ("[A] plaintiff need not affirmatively allege the citizenship of each member of a defendant LLC if it is unable to do so after a reasonable investigation."). However, Chasan did allege that PBBPH's managing partner, Pierce, is a California resident, and that, unlike Chasan, "none of the Defendants are Pennsylvania citizens or residents." (App. at 18, 32.) In light of those allegations, and the absence of any factual challenge to them by Pierce or PBBPH, we will accept that Chasan has sufficiently pled that the parties are completely diverse. Accordingly, the District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). In conducting such a review, we "are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Id.* (quoting *Jordan v. Fox, Rothschild, O'Brien*

agreement?[5]  Because it is clear from Chasan's own allegations that the parties never did reach an agreement on an essential term of their purported bargain, we answer that question in the negative and will affirm the judgment of the District Court.

Pennsylvania law does not require that an agreement be formalized in writing for it to be effective.  "Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement."  *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999).  However, "it is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain[,]" meaning "there is nothing for the court to enforce."  *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998).  The key inquiry is not the extent to which the parties have put their agreement in writing, but rather whether the parties have agreed to the essential terms of a contract.  *Mazzella*, 739 A.2d at 536.

Chasan specifically alleged there were four "essential elements of the agreement between [PBBPH] and Pierce on the one hand, and [Chasan] on the other…."  (App. at 32.)

_____

& *Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994)).  "[W]e may affirm a judgment of a lower court for any reason supported by the record…."  *In re Ross*, 858 F.3d 779, 786 (3d Cir. 2017).

[5] Chasan dedicates a substantial portion of his briefing to arguing about the necessity of Hamilton approving the settlement and the merits of Hamilton's potential claims against him.  But those arguments miss the mark, as they do not address the fundamental question of whether Chasan, Pierce, and PBBPH mutually agreed to each essential term of the supposed bargain.

7

Those "essential elements" include that "Hamilton is released of all further claims by [Chasan], *i.e.,* Hamilton is a third-party beneficiary of the Settlement Agreement." (App. at 32-33.) Despite recognizing, at a minimum, that the terms of any release applicable to Hamilton and Hamilton's status vis-à-vis the settlement (i.e., as a party thereto or a third-party beneficiary thereof) would implicate an "essential element" of the purported agreement among Chasan, Pierce, and PBBPH, Chasan's complaint is unambiguous that the parties never actually reached agreement about that.

Pierce's September 10 "offers" contained no mention of releases, including who would be giving or receiving releases and in what capacity. It was Chasan who, in the September 15 and September 20 communications with Pierce and PBBPH, introduced the idea of Hamilton giving and receiving releases as a party to the settlement agreement. Consequently, neither Chasan's September 15 nor his September 20 communications could have been a binding acceptance of Pierce's September 10 offer. *See Hedden v. Lupinsky*, 176 A.2d 406, 408 (Pa. 1962) ("To constitute a contract, the acceptance of the offer must be absolute and identical with the terms of the offer."); *First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 15 (Pa. Super. Ct. 1994) ("[A] reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counter-offer, having the effect of terminating the original offer.").

Equally significant, the draft release that Chasan proposed was never accepted by those he claimed were his counterparties to the settlement agreement. Pierce responded to the draft by conveying his unavailability over the near term and asking his partners to "work with [Chasan] to wrap this up swiftly." (App. at 25). He did not express an

8

"unconditional and absolute" acceptance of Chasan's proposal, as is required for an effective acceptance under Pennsylvania law. *O'Brien v. Nationwide Mut. Ins. Co.*, 689 A.2d 254, 258–59 (Pa. Super. Ct. 1997) (quoting *Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 887 (Pa. Super. Ct. 1985)). To the contrary, if Pierce made any "unconditional and absolute" expressions at all, it was that more work needed to be done before any settlement could be finalized. [6]

Although Chasan acknowledges that "Pierce and [PBBPH] have not accepted the proposed amended Settlement Agreement that Chasan sent on 11/16/2018," he nevertheless alleges that the proposed agreement should be considered binding because it was merely a "non-material revision of what [Pierce's partner] had previously drafted on behalf of [PBBPH][,]" specifically the Pierce/PBBPH October 30 proposal. (App. at 31, 34.) That, however, simply ignores the fact that, by November 16, Chasan's power to accept the October 30 offer, including the proposed unilateral release for Hamilton, had been terminated independently by at least three events: (i) Chasan's own explicit rejection of the October 30 offer; (ii) his counterproposals made that same day; and (iii)

---

[6] Pierce's partners similarly did not "unconditionally and absolutely" accept Chasan's proposal. Instead, they (i) provided "initial comments" and noted that "there are a few points of clarification that will be needed"; and (ii) sent Chasan a revised draft of the settlement agreement that contained "material modifications that Chasan could not accept[,]" including eliminating Hamilton's obligation to release any of his claims against Chasan. (App. at 25, 27.) That amounted to a rejection of Chasan's proposal and a counter-offer – not an acceptance. *See Armbruster*, 491 A.2d at 887 ("An alleged acceptance is not unconditional, and is thus not an acceptance, if it alters 'the terms of the offer in any material respect....'" (quoting 1 A. Corbin, Corbin on Contracts § 82 (1963)); *First Home*, 648 A.2d at 15.

9

Pierce/PBBPH sending Chasan a further revised offer on November 8. *See* 1 Timothy Murray, Corbin on Contracts § 2.20 (2019) ("The making of an alteration in the terms of the offer, or the making of a new offer involving the same subject matter, communicated to the offeree, will end the power to accept the original offer, without using any express words of revocation."). It also ignores that Chasan's November 16 proposal was a "modification" of the October 30 proposal "with material inserted from" the November 8 proposal, a violation of the mirror-image rule, which mandates that an offer and acceptance be identical.[7] *Hedden*, 176 A.2d at 408. Accordingly, it is clear from Chasan's complaint that the parties never reached a final settlement agreement.

## III. CONCLUSION

Chasan's attempt to manufacture a binding agreement by piecing together a series of rejected offers and untimely acceptances finds no support under Pennsylvania law. Accordingly, we will affirm the judgment of the District Court.

---

[7] For similar reasons, to the extent Chasan would argue that he accepted the Pierce/PBBPH November 8 proposal and that a binding contract was formed based on that proposal, such argument is without merit. The November 8 proposal and Chasan's November 16 proposal differ fundamentally in that Hamilton is noted as a party to the former but not the latter.