J-A27042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARY GILBEY STRUB | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ADRIANNE BERNICE WESOL, | : | No. 2904 EDA 2024 |
| EXECUTRIX, ESTATE OF BRIAN J. | : | |
| WESOL, JOHN REGAN | : | |

Appeal from the Order Entered October 28, 2024
In the Court of Common Pleas of Pike County Civil Division at No(s):
2019-00137

| | | |
|---|---|---|
| MARY GILBEY STRUB | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ADRIANNE BERNICE WESOL, | : | |
| EXECUTRIX, ESTATE OF BRIAN J. | : | |
| WESOL, JOHN REGAN | : | No. 3022 EDA 2024 |
| | : | |
| | : | |
| APPEAL OF: ADRIANNE BERNICE | : | |
| WESOL, AS EXECUTRIX OF THE | : | |
| ESTATE OF BRIAN J. WESOL | : | |

Appeal from the Order Entered October 28, 2024
In the Court of Common Pleas of Pike County Civil Division at No(s):
2019-00137

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED APRIL 23, 2026**

Mary Gilbey Strub ("Strub"), Appellant/Cross-Appellee, and Adrianne

Bernice Wesol as Executrix of the Estate of Brian J. Wesol ("Estate") ("Wesol"),

Appellee/Cross-Appellant, each appeal from the judgment entered by the Pike County Court of Common Pleas ("trial court") in favor of Strub following a bench trial. Strub obtained the judgment in a civil action she brought against Wesol related to the aborted sale of residential real estate owned by Wesol's deceased brother in Milford Borough (the "Property"). In these cross appeals, we consider the parties' claims of error regarding the trial court's determination that: (1) the parties' Agreement of Sale (the "Agreement") included terms handwritten by Strub; (2) Wesol breached these terms; (3) Strub elected the remedy of rescission; (4) Strub was entitled to damages from Wesol amounting to $45,097.42 plus costs; (5) Strub introduced speculative evidence in support of additional claims of damage; and (6) Strub's motion to inspect the Property was untimely. Upon review, we affirm the judgment in part and vacate it in part and remand for further proceedings.

### Facts and Procedural History

<u>Auction of the Property</u>

Following her appointment as executrix of the Estate of her late brother, Wesol contracted with John Regan ("Auctioneer Regan") to sell the Property by public auction. N.T., 8/15/2023, at 8, 11-12; **see also** Wesol's Exhibit 1 (auctioneer agreement) (providing that Auctioneer Regan "will act as the Seller agent and conduct a public auction" of Property, using his "professional skills, knowledge, and experience to the best advantage of both parties in preparing for and conducting the auction," in exchange for a three percent

fee). Wesol also hired Projan Cleaning & Restoration, Inc. ("Projan") to restore the Property from fire and water damage, work that began around April 2018. N.T., 8/15/2023, at 139.

On October 28, 2018, with Wesol in attendance, Auctioneer Regan conducted a public auction in the backyard of the Property. Strub attended the auction after touring the Property, including the home's interior, on the day of and the day before the auction. N.T., 10/11/2022, at 9-14.

Prior to accepting bids on the Property, Auctioneer Regan explained the terms of the auction and sale and informed attendees that he was recording the auction. Strub's Exhibit 14 at 2 (auction transcript). Such terms included "a $25,000 check" payable to the Estate's attorney and Auctioneer Regan's fee, described as "a five percent premium today made payable to myself." *Id.* at 2-3.

Auctioneer Regan announced that "we are offering" to sell the Property with "three contingencies." *Id.* at 2-3. The first was mold: Auctioneer Regan acknowledged that there was "a mold issue in the house," but asserted that "this has been repaired by Projan and we are selling it as a contingency with the certificate that the mold has been concurred, right, however they say it, right?" *Id.* at 3. The second was plumbing, which Auctioneer Regan described as "any spigot, anything that's plumbed in that house right now has to be totally functional … at the time of you taking the house over. So if there's a spigot coming out back, everything gotta be up to copacetic and running when

- 3 -

you get the place." *Id.* The third was that "the heat is totally functional and working the way it should be with … a certified plumber inspection of the heating unit." *Id.* After telling the attendees that "the main things are taken care of, the heating, the plumbing[,] and the mold," Auctioneer Regan further explained that the installation of sheetrock would occur in other rooms, including rooms where a fire has occurred to "put [it] back up to the original condition." *Id.* at 4.

After explaining the bidding procedures, Auctioneer Regan launched the back-and-forth bidding. *Id.* at 4-14. Strub ultimately submitted the winning bid of $700,000.00. *Id.* at 14.

Execution of the Agreement

After the auction concluded, Strub and Wesol conducted a walkthrough of the Property prior to Wesol's flight home to the west coast. N.T., 10/11/2022, 23-26. When Strub inquired about certain incomplete work, Wesol advised that Strub could speak to Auctioneer Regan about the items. *Id.* at 26. Wesol agreed to let Strub return to the Property the following day, accompanied by Auctioneer Regan. N.T., 8/15/2023, at 155. Wesol then signed the Agreement. *Id.* at 145. At that time, it contained only the typewritten terms her counsel had prepared in advance. *Id.*

In Wesol's presence, Strub handwrote her name and the agreed-upon closing date of January 22, 2019. N.T., 10/11/2022, 31-32. Before Wesol left to get ready for her flight home, Strub told Wesol that she needed more

time to review the Agreement and promised to sign it and obtain the necessary checks. *Id.*

At a nearby hotel, Strub reviewed the Agreement in the presence of her brother, as well as Stephanie Matolyak ("Agent Matolyak") and Dave Chant ("Chant"), who, respectively, are a realtor with, and the owner of, Davis R. Chant Realtors ("Chant Realtors"), a realty company Auctioneer Regan had engaged to assist him with the sale. N.T., 10/11/2022, at 32-33. Strub made some handwritten additions on the Agreement's unnumbered third page (hereinafter "Added Terms") and signed the Agreement. N.T., 10/11/2022, at 30-36. Strub gave the signed Agreement to Chant along with a $25,000.00 check payable to Wesol's legal counsel and a $35,000.00 check payable to Auctioneer Regan. *Id.* at 26-37.

Chant delivered the signed Agreement to Wesol before she departed. N.T., 8/15/2023, at 153. Upon reviewing the Agreement on her flight home, Wesol was "stunned" by the Added Terms because "it wasn't what [she] expected." *Id.* Nevertheless, Wesol did not discuss the Added Terms with anyone and accepted the deposit check through her legal counsel. *Id.* at 182, 189, 191.

Terms of the Agreement

The Agreement, signed and dated October 28, 2019, provided that the Estate "c/o" Wesol, the "Seller," would sell the Property to Strub, the "Buyer," in exchange for $700,000.00, paid to Wesol in two installments: $25,000.00

as a deposit upon signing the Agreement and $675,000.00 payable at a closing set for January 22 without a specified year.  Agreement,[1] ¶¶ 1(a)-(b), 9.  The deposit "is non-returnable and non-refundable for any and all reasons except failure of Seller to provide good and marketable title.  Seller shall have sixty … days from notice of title defect to cure any such defect uncovered by a title search."  *Id.* ¶ 1(c) (capitalization and font altered).

If Strub should "violate or fail to fulfill and perform any of the terms or conditions of this agreement," the Agreement authorized Wesol to elect to retain the $700,000.00 "either on the account of the purchase price, or as liquidated damages for such breach," and the Agreement would be nullified and Wesol would be released from all liability or obligation.  *Id.* ¶ 5.  "In the event of default by Seller, Buyer shall be refunded all monies paid to Seller under this Agreement within ten … days after the sixty[-]day period provided herein to remedy any title defect."  *Id.*

> Regarding the Property's condition, Strub and Wesol agreed
>
> that there shall be no inspections by authorized appraisers, reputable certifiers, insurer's representatives, surveyors, municipal officials and/or Buyer as Buyer has already inspected the premises, and the premises are being sold "AS IS", including inspections of on [sic] the septic and well.  Buyer has had the opportunity to make reasonable inspections, surveys and examinations and waives any further inspections.

---

[1]  The trial court found that Strub's Exhibit 2 and Wesol's Exhibit 2 were identical copies of the Agreement.  For ease of citation, we cite the Agreement directly instead of the exhibits.

*Id.* ¶ 10.  They also agreed that "Seller shall, at its own cost and expense, maintain the premises in good order and repair and transfer the premises in the same condition as of the date of this agreement, reasonable wear and tear excepted." *Id.* ¶ 11.  However, paragraph fifteen provided implicit exceptions to these two paragraphs: "The premises are currently under repair as to the heating unit, water system and mold remediation.  Seller represents that said repairs shall be satisfactorily completed by the closing date.  Costs of said repairs shall be borne by the Seller." *Id.* ¶ 15.

On the bottom of the prior page immediately preceding paragraph fifteen, Strub handwrote the Added Terms, set forth verbatim:

> Closing conditioned on
> all repairs to be made as per auctioneer's
> recording, including without limitation,
> the drywalling + painting of all areas
> ~~where~~ where ^ fire, flooding, mold damage occurred to make
> good, including putting the closet fixtures.

*Id.* at 3.[2]

<u>Post-Execution</u>

Before departing for her home overseas, Strub returned to the Property twice more, accompanied by Auctioneer Regan.  N.T., 10/11/2022, at 37-40, 44-47.  Wesol, Strub, and Auctioneer Regan engaged in email correspondence throughout November and December 2018, discussing, inter alia, the progress

---

[2]  Strub also added handwriting to the fourth page of the unnumbered Agreement, unrelated to this appeal, pertaining to the Estate's personal property.

of the work in the house and obtaining Wesol's permission for Chant Realtors to show the house to prospective tenants to fulfill Strub's desire to rent the Property after closing. *See* Strub's Exhibit 4 at 1-4 (email correspondence) (pagination supplied).

Wesol wrote on November 10, 2018, that she would be meeting with the workers to review a "punch list" because the "workers are finished in the house," and inquired if there was anything Strub wanted Wesol to add to the punch list. *Id.* at 2. The following day, Strub emailed Wesol with a list of outstanding items, asserting that Auctioneer Regan had committed to address such issues. *Id.* In a reply, Wesol thanked Strub for the "repair list," and stated that she would have her contractor "work on what he is obligated to do and let [Auctioneer Regan] take care of the rest" of what he committed to do in conversations to which Wesol was "not privy." *Id.*

Strub hired Igor Smetaniuk ("Inspector Smetaniuk") to conduct an inspection of the home and to prepare a report. N.T., 10/12/2022, at 40. Wesol acknowledged that she agreed when Auctioneer Regan asked her if Strub could have Inspector Smetaniuk come to the Property to assess Projan's work. N.T., 8/15/2023, at 157-58. Upon inspecting the Property several times in November and December 2018, Inspector Smetaniuk did not find the heating and plumbing systems to be "fully functional" and found it to be "undeterminable" whether the mold remediation was complete. N.T., 10/12/2022, at 105, 114, 143, 150-53. Following her receipt of Inspector

Smetaniuk's report, Strub wrote to Wesol on December 28, 2018, expressing concern that Wesol would not be able to complete the unfinished items in time for closing. Strub's Exhibit 5 at 1-2 (letter from Strub to Wesol).

Two days before the scheduled closing, Wesol and Strub met in Milford. N.T., 10/11/2022, at 74. According to Strub, she told Wesol that the repairs needed to be made because she had a tenant lined up to rent the Property after closing, and Wesol did not dispute Strub's assertion that the work was incomplete. *Id.* at 75-79. Wesol, on the other hand, claimed that she told Strub at this meeting that Projan recently finished its work. N.T., 8/15/2023, at 163. Closing on the sale of the Property did not occur as scheduled on January 22, 2019. Both Strub and Wesol claim that they were ready, able, and willing to close, but that the closing did not occur because of the other's breach of the Agreement. N.T., 10/11/2022, at 134-35; N.T., 8/15/2023, at 166.

### Civil Action

Strub initiated the instant legal action against Wesol and Auctioneer Regan on January 29, 2019. In the first count of her complaint, labeled specific performance, Strub sought to compel Wesol to sell her the Property pursuant to the Agreement, with a reduction in purchase price corresponding to Strub's costs in making repairs. Strub's Complaint, 3/13/2019, ¶¶ 30-32. In the second count labeled recission, Strub sought to rescind the Agreement based upon Wesol's failure to comply with the Agreement's material terms.

*Id.* ¶¶ 33-36. Under this count, Strub argued that she suffered "damages and losses." *Id.* ¶ 36. In her third count, Strub sought recovery of the $35,000.00 auction premium from Auctioneer Regan, claiming that Regan would be unjustly enriched if he were allowed to retain the premium. *Id.* ¶¶ 37-41.

Auctioneer Regan and Wesol each answered Strub's complaint, generally denying the allegations thereof, and Wesol filed new matter and a crossclaim against Auctioneer Regan. *See generally* Auctioneer Regan's Answer, 5/13/2019; Wesol's Answer, New Matter, and Crossclaim, 6/4/2019. Auctioneer Regan filed an answer to the crossclaim and Strub filed a reply to Wesol's new matter. *See generally* Auctioneer Regan's Answer to Crossclaim, 7/1/2019; Strub's Reply to New Matter, 6/20/2019.

Approximately one month before the scheduled trial, Strub moved to compel entry upon the Property for the purpose of conducting an updated inspection. Motion to Compel Entry, 9/1/2022, ¶ 8. Following receipt of the defendants' responses and a hearing, the trial court entered an order denying the motion on October 5, 2022.

The trial court presided over a nonjury trial on October 11-12, 2022, and May 23 and August 15, 2023. Multiple times during the trial, Wesol objected to Strub's introduction of evidence, claiming that the nature of Strub's specific performance and rescission claims precluded her from presenting evidence regarding damages. The trial court overruled the objections, stating that it would receive such evidence because it could later

- 10 -

determine that "a measure of damages" are appropriate "if it's a breach of contract." ***See*** N.T., 10/11/2022, at 80-83; ***see also***, N.T., 5/23/2023, at 77-81, 113-15, 125-28, 139-42, 177-184.

Following the closure of the record, the parties filed post-trial briefs. On the issue of Strub's available remedies in the event of a breach, the parties maintained their trial positions. ***See*** Wesol's Post-Trial Brief, 11/3/2023, at 14-16 (citing ***Umbelina*** and other cases in support of its argument that Strub cannot seek monetary breach-of-contract damages as "part of her rescission count"); Strub's Post-Trial Brief, 12/5/2023, at 18-19, 38-48 (arguing that: (1) without an updated inspection she is "compelled to seek damages as her remedy" instead of "seeking specific performance" … to … "buy the proverbial 'pig-in-a-poke'"; (2) she was entitled to reasonably foreseeable damages for loss of the benefit of the bargain because Wesol breached the Agreement in bad faith by not completing conditions precedent and conveying the property; (3) "[i]n the alternative, if [she] is merely entitled to a rescission of the contract, she is still entitled to restitution to satisfy her reliance interest"; and (4) the point has not arrived in which she must elect between damages or rescission/restitution).

On June 6, 2024, the trial court entered an order finding in favor of Strub and against Wesol on Strub's claim seeking recission of the Agreement. Trial Court Order, 6/6/2024, at 12 (pagination supplied). The trial court determined that the Added Terms constituted a counteroffer to Wesol's

original offer to sell the house, which became part of the Agreement when Wesol did not repudiate the counteroffer, accepted the deposit check through her counsel, and proceeded to engage the pre-closing process. *Id.* at 6-7. Based upon Wesol's failure to certify that she remediated the mold and ensured that the heating and plumbing systems functioned properly, the trial court determined that Strub proved, by preponderance of the evidence, that Wesol breached the terms of the Agreement. *Id.* at 7-10.

The trial court determined that Strub's complaint sought two "claims for relief": (1) specific performance of the Agreement and (2) "rescission of the Agreement … based on Wesol's alleged non-performance or fraudulent misrepresentation of the Agreement." *See id.* at 2, 7. The trial court sua sponte dismissed Strub's specific performance claim, deeming Strub to have relinquished such claim in her post-trial brief and by failing to present evidence in support thereof at trial. *Id.* at 7. It decided that Strub was "entitled to rescission of the Agreement … based on Wesol's non-performance of the terms and conditions of the parties' Agreement." *Id.* at 7.

Upon rescinding the Agreement, the court "assess[ed]" Strub's "monetary damages." *Id.* at 10. It ordered Wesol to (1) "reimburse" the $25,000 deposit and (2) "pay damages to Strub" in the amounts of $5,700 for surveying fees and $2,800 for inspection fees. Trial Court Order, 6/6/2024, at 12. It concluded that Strub was entitled to these damages because she paid them "in reliance on the parties' Agreement." *Id.* at 10. It declined to

award Strub damages for the loss of the benefit of the bargain, including anticipated rental income and increased property value, reasoning that such special damages were "too speculative" because Strub did not prove them with "evidence of 'a fair degree of probability,'" or "sufficient specificity." *Id.* at 10-11 (citing *Exton Drive-In, Inc. v. Home Indemnity Co.*, 261 A.2d 319, 324 (Pa. 1969)). The court dismissed Strub's unjust enrichment claim against Auctioneer Regan, finding that Strub is not entitled to recover the $35,000.00 auctioneer's premium because Auctioneer Regan announced the fee at the outset of the auction, and when Strub submitted the winning bid, she agreed to be liable to Auctioneer Regan for the fee that he had earned by performing "his required auctioneer duties." *Id.* at 11. Finally, the court dismissed Wesol's crossclaim against Auctioneer Regan, explaining that Auctioneer Regan "discharged his auctioneer duties as required" and "did not breach his contractual obligations to Wesol." *Id.* at 10-11. The court emphasized that it was Strub who inserted Auctioneer Regan's representations into the Agreement and that its decision to rescind the Agreement "is based on Wesol's failure to complete the[] terms of the parties' Agreement and not on any actions or inactions of [Auctioneer] Regan." *Id.* at 11.

Both Strub and Wesol sought post-trial relief. *See generally* Strub's Motion for Post-trial Relief, 6/17/2024; Wesol's Motion for Post-trial Relief, 6/26/2024. Strub continued to argue in the alternative. First, she asserted that she was entitled to a new trial because the court erred by denying her

pretrial motion to inspect the Property, which forced her to forgo her preferred remedy of specific performance. Strub's Post-Trial Motion, 6/17/2024, at ¶¶ 13-25. Alternatively, she sought to modify the trial court's "damages award" to include prejudgment interest and various damages to which she contends she proved her entitlement at trial. *Id.* ¶¶ 26-71. Among other issues, Wesol continued to argue that Strub was not entitled to damages because she only pled rescission. Wesol's Post-trial Motion, ¶¶ 30-45; Wesol's Answer to Strub's Post-trial Motion, ¶¶ 34-65. Following argument, the trial court denied both motions, except it granted Strub's motion solely as to her request for prejudgment interest. Order, 10/11/2024, ¶¶ 1-5. Strub filed a praecipe to enter judgment, following which the prothonotary entered judgment on October 28, 2024, in favor of Strub and against Wesol in the amount of $45,097.42 plus costs.

## Cross-Appeals

Wesol and Strub timely filed notices of appeal.[3] This Court subsequently consolidated the appeals, designating Strub as the lead appellant. Strub, Wesol, and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

<u>Issues</u>

---

[3] Auctioneer Regan has not participated in either appeal.

- 14 -

Each party presents two issues for our review, which we summarize for conciseness. Strub's issues are: (1) whether the trial court erred by refusing to award Strub damages from Wesol for Strub's lost rental opportunity, the increase in the Property's value from the date of Wesol's breach to the date of entry of judgment, and the auctioneer's fee because Strub elected damages as a remedy and proved her entitlement to such damages; and (2) alternatively, whether the trial court erred in denying her motion to inspect the Property, and, if so, whether she is entitled to a new trial on remedies after inspecting the Property. Strub's Brief at 3-4.

Wesol's issues are: (1) whether the trial court erred by determining that Strub and Wesol entered into a valid, binding contract consisting of the typewritten Agreement with Strub's handwritten counteroffer and that Wesol breached the Agreement; and (2) whether the trial court erred in awarding Strub reimbursement for fees she expended to have the property surveyed and inspected when the Agreement expressly prohibited inspections and such monies do not constitute restitution. Wesol's Brief at 52.

Standards of Review

In reviewing the parties' issues, we abide by the following standard of review:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial court must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most

favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary. The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*El-Gharbaoui v. Ajayi*, 260 A.3d 944, 958 (Pa. Super. 2021) (citation omitted). Because it is the factfinder's job to assess credibility and conflicts in evidence in the first instance, our standard of review prohibits this Court from reexamining the factfinder's weight and credibility determinations or substituting our judgments for those of the factfinder. *Gutteridge v. J3 Energy Grp., Inc.*, 165 A.3d 908, 916 (Pa. Super. 2017). Instead of considering whether we would have reached the same result, we decide whether the trial court reasonably could have reached its result based upon the evidence it found credible. *Id.*

The determination of whether a contract exists "implicates questions of fact, for which our standard of review is deferential to the factfinder." *Glover v. Junior*, 333 A.3d 323, 338–39 (Pa. 2025) (citing, inter alia, *Field v. Golden Triangle Broadcasting, Inc.*, 305 A.2d 689, 691 (Pa. 1973) ("[W]hen the evidence is conflicting as to whether the parties intended that a particular writing would constitute a complete expression of their agreement it has been held that it is a question of fact for the trier of fact to determine whether a contract exists[.]")). If an agreement exists, a court must interpret it according to its plain language; contract interpretation presents a question

- 16 -

of law that we review de novo with a plenary scope. ***Vinculum, Inc. v. Goli Techs., LLC***, 310 A.3d 231, 242 (Pa. 2024).

> We review damage awards pursuant to the following standard:
>
> The duty of assessing damages is within the province of the fact-finder and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence. … The fact-finder must assess the worth of the testimony, by weighing the evidence and determining its credibility and by accepting or rejecting the estimates of the damages given by the witnesses.

***Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Fam. Mkt., Inc.***, 98 A.3d 645, 659–60 (Pa. Super. 2014) (cleaned up).

Finally, this Court reviews orders concerning discovery for an abuse of discretion. ***Anthony Biddle Contractors, Inc. v. Preet Allied Am. St., LP***, 28 A.3d 916, 922 (Pa. Super. 2011).

### Wesol's Cross-Appeal: Terms of the Agreement

We begin with Wesol's issue concerning the terms of the Agreement. She argues that the trial court erred by concluding that the Agreement included the Added Terms handwritten by Strub. Wesol's Brief at 58. Wesol contends that such terms constituted a counteroffer to which she never assented, as evidenced by her failure to "re-sign the Agreement as modified by Strub, initial the modifications, or do anything else in writing to indicate that she accepted Strub's counteroffer." ***Id.*** By depositing the check and engaging in the preclosing process, Strub claims, she accepted only "the terms

of the typewritten Agreement, as it was presented when she signed it, without Strub's interlineations." *Id.* According to Wesol, her November 11, 2018 email to Strub conveyed a rejection of the Added Terms by stating that Auctioneer Regan could "take care of what he committed to" when responding to Strub's list of incomplete repairs. *Id.* at 59 (citing Strub's Exhibit 4 at 2 (email correspondence)).

"Generally, in order for a contract to be formed, there must be three requisite elements: an offer, acceptance, and consideration." *Glover v. Junior*, 333 A.3d 323, 339 (Pa. 2025) (quotation marks, brackets, and citation omitted). "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Somerlot v. Jung*, 343 A.3d 324 (Pa. Super. 2025) (citation omitted). "Further, it is well established that the acceptance of any offer ... must be unconditional and absolute." *Yarnall v. Almy*, 703 A.2d 535, 539 (Pa. Super. 1997) (quotation marks and citation omitted). "[A] reply to an offer which purports to accept it, but changes the conditions of the offer, is not an acceptance but is a counteroffer, having the effect of terminating the original offer." *First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 15 (Pa. Super. 1994); *see also Hedden v. Lupinsky*, 176 A.2d 406, 408 (Pa. 1962) (concluding that sending a subcontract to offeree "with terms in variance with those" in original offer was a counteroffer); *Somerlot*, 343 A.3d at 333 (defining a counteroffer as "an offer

made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer") (quoting Restatement (Second) of Contracts § 39)).

A party may accept an offer by conduct; thus, "what the parties do pursuant to the offer is germane to show whether the offer is accepted." ***Accu-Weather***, ***Inc. v. Thomas Broad. Co.***, 625 A.2d 75, 78 (Pa. Super. 1993) (cleaned up); ***see also Ingrassia Const. Co. v. Walsh***, 486 A.2d 478, 483 (Pa. Super. 1984) ("In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter."). However, because "[g]eneral acquiescence to a course of conduct" does not establish offer and acceptance, there must be specific facts indicating that the parties "each know the terms of the contract and they must both assent to those terms." ***Glover***, 333 A.3d at 339, 341.

Here, the record and the law support the trial court's factual findings and legal conclusions. The typewritten Agreement prepared by Wesol's counsel constituted Wesol's offer to sell Strub the Property in accordance with the terms therein. The Added Terms, which Strub wrote by hand before she returned the signed Agreement with the requisite checks for the auctioneer's fee and the deposit, related to the same matter as the original offer and proposed a substituted bargain regarding the condition of the Property. Instead of merely representing that specified repairs regarding the "heating

unit, water system[,] and mold remediation shall be satisfactorily completed by the closing date," *see* Agreement, ¶ 15, Strub proposed that the closing now be "conditioned on all repairs to be made as per auctioneer's recording," *see id.* at 3. Under basic contract law, the handwritten paragraph added to page three constituted a counteroffer. *See First Home Sav. Bank*, 648 A.2d at 15.

At that point, Wesol had a choice to either reject the terms of the counteroffer or accept them and proceed with the Agreement as amended. *See id.* She could not, as she now contends, simply proceed under the terms of the original offer, as Strub did not agree to that offer as written and Strub's counteroffer terminated the original offer. *See id.* The trial court concluded correctly that by accepting the deposit check and proceeding towards closing, Wesol implicitly agreed to the handwritten terms in the counteroffer. That Wesol was not present when Strub added the terms is of no consequence; the Agreement did not require the parties to execute the contract at the same time and place. *See* Agreement, ¶ 13 (providing that the parties may execute the Agreement in counterparts). Furthermore, by accepting the deposit check, Wesol had already accepted Strub's counteroffer by the time she sent the November 15, 2018 email purportedly disavowing the terms of the deal proposed by Strub. Accordingly, the trial court did not err in concluding that the parties' binding Agreement consisted of the typewritten terms originally proposed by Wesol and the handwritten Added Terms counteroffered by Strub.

**Wesol's Cross-Appeal: Breach of the Agreement**

Wesol next argues that even if the Added Terms were part of the Agreement, the trial court erred by finding that she breached the Agreement because she completed all required repairs by closing. Wesol's Brief at 59. Specifically, she contends that a plumber certified that the heating system worked in November 2018, and Projan completed the required mold remediation, heating and plumbing work, and installation of sheetrock by January 17, 2019, which was five days prior to the scheduled closing date. *Id.* at 60. Wesol maintains that she informed Strub of the completed repairs during their January 20, 2019 meeting. *Id.* She acknowledges that she did not provide a mold remediation certificate, but she argues that Pennsylvania law does not require one and Strub's agent did not indicate that any conditions were not satisfied in the preclosing documents immediately prior to closing. *Id.* Because Strub's inspector last visited the property on December 15, 2018, Wesol argues that Strub failed to prove that Wesol did not complete the repairs by closing, and it was Strub, not her, who breached the Agreement by not proceeding with the closing. *Id.* at 61.

Wesol's arguments miss the mark. She essentially asks this Court to credit her testimony over Strub's in contravention to this Court's standard of review. Having heard from both Strub and Wesol, the trial court credited Strub's testimony that problems persisted with the plumbing and heating systems. Order, 6/4/2024, at 7-10 (citing N.T., 10/12/2022, at 53 (Strub's

testimony that as of November 24, 2018, the kitchen and powder room faucets had not been repaired or replaced and that the utility sink in the basement had not been reinstalled); N.T., 10/11/2022, at 78 (Strub's testimony that there were problems with various points of heat distribution and thermostat controls)).  It further found that although Wesol testified that she paid a certified plumber to inspect the heating and plumbing system in November 2018, she failed to present a witness from the plumbing company and thus did not prove that the plumbing company did, in fact, do the work for which she paid them.  *See* N.T., 8/15/2022, at 174.  This Court cannot reexamine the trial court's credibility findings or simply substitute our judgment for that of the trial court.[4]  *See Gutteridge*, 165 A.3d at 916.

Furthermore, the trial court correctly interpreted the Agreement as requiring Wesol to do more than complete the work.  Because the Added Terms specified that the closing was conditioned on all repairs being made per the auctioneer's recording, and Auctioneer Regan stated during the auction that the sale was subject to several contingencies regarding its condition, the

---

[4] Even if we could disregard the trial court's factual findings, Wesol's testimony does not always establish the factual assertions she makes in her brief.  For example, while Wesol insinuates that Projan fixed the issues discovered by Strub's inspector after the inspection, *see* Wesol's Brief at 61, the testimony she presented from the president of Projan did not necessarily establish this.  Projan's president, who had never personally visited the Property, based his conclusion that Projan completed the requested work by its submission of a final invoice several days before closing, despite also admitting that the invoice did not expressly show that Projan worked on the boiler system.  *See* N.T., 8/15/2022, at 101-08, 117-23.

court concluded that Agreement required Wesol to demonstrate to Strub that the work was complete. *See* Trial Court Order, 6/14/2024, at 3-4 (describing three contingencies) (citing Strub's Exhibit 14 at 2-4 (auction transcript)).

Specifically, because the Added Terms incorporated Auctioneer Regan's statement at auction that Wesol would provide a "certificate that the mold has been concurred," which the trial court interpreted as remediated or repaired, Wesol was contractually obligated to provide a certificate to Strub, whether Pennsylvania law requires a mold remediation certificate or not. *Id.* Despite Projan's completion of mold remediation work, Wesol never asked Projan to certify the remediation, let alone provided any certification to Strub, rendering Wesol in breach of the Agreement. *Id.* at 8, 10 (citing N.T., 8/15/2023, at 120-21).

Likewise, whether Wesol obtained plumbing and heating work was not dispositive of whether Wesol insured, to Strub, that the plumbing and heating systems were totally functional as of the date of closing. *Id.* at 8-10. Despite Wesol's testimony that she had work done and that she personally believed that such systems were working, the court determined that Wesol did not satisfy her contractual obligation to provide Strub with a representation that a certified plumber had ensured the systems worked (or even otherwise representing to Strub that the plumbing and heating systems were functioning properly at the time of closing). *Id.* The trial court determined that Wesol only made one representation regarding the condition of the house—her

asserton in the November email that the work was complete—when such work was not in fact complete, and that Wesol did nothing "to certify or ensure the completed repairs" even after Strub inquired about the incomplete repairs in her December 28, 2018 letter to Wesol. Trial Court Opinion, 1/21/2025, at 12-15 (citing Strub's Exhibit 12 (12/28/2018 letter); N.T., 8/15/2023, at 190-91).

Viewing the evidence in the light most favorable to Strub, as our standard of review requires, we conclude that there is sufficient evidence in the record supporting the trial court's legal conclusion that Wesol breached the Agreement and that such breach was material, thereby permitting Strub to avoid her contractual obligations to tender the remaining amount of the purchase price at closing. *See True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 340 (Pa. Super. 2016) (a material failure of performance when such performance is due discharges the non-breaching party from liability under the agreement).

**Damages Claims**

Strub's Appeal: Election of Remedies

*Merits of the Claim Raised*

Turning to the damage-related claims raised by the parties, we first address Strub's contention concerning her election of remedies. Strub argues that the trial court erred by determining, for the first time in its Rule 1925(a)

opinion, that she could not obtain compensatory damages because she sought rescission in her complaint. Strub's Brief at 31.

The court originally explained that it declined to award what it classified as "special damages" to Strub because the evidence she offered in support was too speculative. Trial Court Order, 6/6/2024, at 10-11. It maintained this rationale in its Rule 1925(a) opinion but further added that it denied compensatory damages because they were precluded by Strub's choice of rescission as a remedy. Trial Court Opinion, 1/21/2025, at 9 (citing ***Umbelina v. Adams***, 34 A. 3d 151 (Pa. Super. 2011)).

Strub argues that her complaint brought a cause of action for breach of the Agreement and sought three alternative remedies: specific performance, rescission, and damages. Strub's Brief at 16, 18. Strub acknowledges that she cannot both recover damages and rescind the Agreement, but she maintains that she—and only she—retained the ability to elect a remedy up until final judgment. ***Id.*** at 31-32; ***see also*** Strub's Reply Brief at 5. According to Strub, the trial court's denial of her motion to inspect the Property the month before trial forced her to relinquish her claim for specific performance. Reply Brief at 4. Strub then pursued damages by presenting evidence at trial in support, electing damages in her post-trial brief, seeking relief for denial of damages in her post-trial motion, and entering judgment for the monetary amounts awarded. Strub's Brief at 31-32; Strub's Reply Brief at 4-5. Strub insists that she is not seeking a windfall of damages plus

rescission; she elected compensatory damages, including damages to give her the benefit of the bargain, in place of rescission, which renders *Umbelina* inapposite. Strub's Reply Brief at 3, 5.

Wesol disputes that Strub elected damages, and counters that even if she had, because she pled a claim for rescission and the trial court elected to rescind the Agreement, her only recourse is obtaining restitution, not damages. Wesol's Brief at 41, 61. Of the monetary amounts awarded by the trial court, Wesol contends that only returning the deposit money constitutes proper restitution because it returned Strub back to her pre-deal position. *Id.* at 42, 62. Awarding her damages for an increase in value and a lost rental opportunity would provide a windfall to Strub, Wesol argues, because it puts Strub in a better position than the one she was in just before she signed the Agreement. *Id.* at 43-44.

The law requires the establishment of three elements to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages, i.e., those damages suffered from the breach. *412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 656–57 (Pa. Super. 2016). Although the complaint did not expressly refer to it as such, the facts pled by Strub sound in breach of contract. *See id.* ("[A] complaint need not identify specific legal theories, but it must provide essential facts to support the claim.").

The complaint brought two counts against Wesol, one of which was entitled "**SPECIFIC PERFORMANCE**" and the other "**RECISSION**." Complaint, 3/13/2019, ¶¶ 30-36. Both are equitable remedies in lieu of monetary damages in a breach of contract action. *Oliver v. Ball*, 136 A.3d 162, 167 (Pa. Super. 2016) (explaining that "specific performance is an appropriate remedy to compel the conveyance of real estate where a seller violates a realty contract and specific enforcement of the contract would not be contrary to justice"); *Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 766 (Pa. Super. 1999) ("Rescission is an equitable remedy, to be granted only where the parties to a contract can be placed in their former positions with regard to the subject matter of the contract.").

Notwithstanding the rescission title, paragraph thirty-six of count two thereunder appears to be an ad damnum clause, in which Strub alleged that she "suffered damages and losses" in the amount of $127,539.00 resulting from Wesol's "defaults." Complaint, 3/13/2019, ¶ 3. Paragraph 36 listed, non-exhaustively, the deposit, Auctioneer Regan's fee, engineering fees, inspection fees, legal fees for subdividing, loss of rental income, and mortgage application/appraisal fees. *Id.* The "wherefore" clause attached to the second count prayed that the trial court rescind the Agreement and award her $127,539.00.

Recovery of damages is inconsistent with the equitable doctrine of rescission. *See Wedgewood Diner, Inc. v. Good*, 534 A.2d 537, 538 (Pa.

Super. 1987) ("One may not terminate contractual obligations and seek the return of his consideration based upon the other party's promise through an action for rescission and restitution and at the same time seek the full benefits of that promise through an action for breach.") (citation omitted). *Id.* (citations omitted). To invoke the equitable remedy of rescission is to disaffirm a contract and restore the status quo; the legal remedy of recovering damages, on the other hand, affirms the contract. *Id.*; *see also Roberts v. Est. of Barbagallo*, 531 A.2d 1125, 1132-33 (Pa. Super. 1987) ("The remedies are inconsistent because the one is based on the abrogation of the sale and the other is based on the continued existence of the sale."). To prevent a party from receiving a "windfall or double recovery for a single injury," a party must choose between inconsistent remedies. *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 217 A.3d 1227, 1234–35 (Pa. 2019) (citation omitted) (affirming this Court's reversal of trial court's award of damages and rescission of a lease because the non-breaching party may not recover inconsistent remedies for the same injury). "[O]nce a party makes a 'binding' election of one remedy over other inconsistent remedies, it is precluded from thereafter maintaining an action on those inconsistent remedies." *Gamesa*, 217 A.3d at 1238-39.

However, absent a prior binding election of remedies through prior litigation or post-breach conduct,[5] a party generally does not need to elect a particular remedy at the pleading stage. *See id.* at 1238-39; *see also* Pa.R.Civ.P. 1021(a) (allowing a complaint to demand relief in the alternative or of several different types). As such, "a party may generally simultaneously plead and attempt to prove alternative causes of action seeking damages through inconsistent remedies supported by the same factual scenario." *Gamesa*, 217 A.3d at 1239. When a party seeks alternative and inconsistent remedies, the party must elect between such "remedies at some point prior to the entry of a final judgment." *Schwartz v. Rockey*, 932 A.2d 885, 892 (Pa. 2007).

Our review of Strub's complaint reveals that, although not a model of artful pleading, it adequately alleged that Wesol breached the Agreement and, as a remedy, prayed for legal or equitable relief, as indicated by its references to money damages, specific performance, and rescission. *Cf. Martindale Lumber Co. v. Trusch*, 681 A.2d 803, 805-06 (Pa. Super. 1996)

_____

[5] *See Gamesa*, 217 A.3d at 1239 (an electing party becomes bound by its election and "may no longer pursue alternative forms of relief on a given claim" once "there has been a legal resolution, such as a settlement, a stipulation, a waiver, an expressed withdrawal or abandonment of claims, a judgment, or application of another exclusionary rule"); *id.* at 1243 (a "non-breaching party to a contract may, by its conduct following a breach, conclusively elect its remedy and be bound by it to one theory for recovery of damages;" the non-breaching party cannot sue for rescission after it continued to perform and receive benefits under the contract for over three years post-breach).

(determining that the lower court erred by awarding monetary damages in a case seeking only equitable relief because a general plea in a complaint for "such other and further relief ... as your Honorable Court may deem proper" was insufficient to plead entitlement to monetary damages pursuant to Pa.R.Civ.P. 1021(a)). The record supports Strub's assertion that she presented evidence to support her prayer for damages at trial and maintained her pursuit of such damages throughout the litigation. *See, e.g.,* N.T., 10/11/2022, at 80-83, N.T., 5/23/2023, at 77-81, 113-15, 125-28, 139-42, 177-184 (permitting Strub to introduce evidence of damages over Wesol's objections); Strub's Post-Trial Brief, 12/5/2023, at 18-19, 38-48; Strub's Post-Trial Motion, 6/17/2024, ¶¶ 26-71. Wesol does not argue that Strub is bound by a prior legal resolution or her post-breach, pre-litigation conduct, nor would the record support such an argument, as Strub promptly filed a cause of action against Wesol after the sale of the Property did not close. *See* N.T., 10/11/2022, at 80. Thus, Strub was entitled to plead inconsistent remedies in the alternative and elect her chosen remedy after she established that Wesol breached the contract and before the entry of judgment. *See* *Gamesa*, 217 A.3d at 1238-39; *Schwartz*, 932 A.2d at 892.

*Umbelina* does not require a contrary conclusion. There, after closing on the sale of the newly constructed home, the Umbelinas "attempted to rescind a fully executed" sales agreement and recover damages in a lawsuit. *Umbelina*, 34 A.3d at 155. At a pretrial conference, the Umbelinas stipulated

- 30 -

that their pleaded remedies were inconsistent, and elected to abandon their legal claims for breach of contract and breach of warranty and proceed on the equitable remedy of rescission of the sales agreement only. *Id.* at 155, 157. The trial court then dismissed the legal claims with prejudice. *Id.* at 155. After a bench trial, the trial court declined to rescind the sales agreement but sua sponte awarded restitution to reimburse them for costs it incurred in remedying the home's faulty construction. *Id.* at 156.

On appeal, this Court decided that the trial court correctly refused to rescind the fully executed contract. *See id.* at 158-60 ("Our courts have ruled that executed contracts cannot be rescinded or annulled in the absence of a showing fraud or mistake simply because a party found the contract to be burdensome or a financial failure."). In the absence of rescission, and without a claim brought for breach of the implied warranty of habitability, we concluded that the trial court erred by awarding restitution. *Id.* at 162.

*Umbelina* is inapposite to the instant case, both because Strub did not make a binding election of rescission and Strub was not seeking to undo a fully executed sales agreement after closing. As such, we agree with Strub that it does not control the outcome here. Thus, to the extent that the trial court relied upon *Umbelina* to justify its decision to elect rescission as Strub's remedy sua sponte, rescind the Agreement, and refuse to award damages for Strub's lost rental opportunity, the increase in the Property's value from breach to judgment, and Auctioneer Regan's fee, it did so in error.

*Waiver*

In a thoughtful concurring and dissenting memorandum ("CDM"), our colleague disagrees with our conclusion that the trial court prematurely elected rescission (and restitution as its counterpart) as Strub's sole remedy on her behalf. CDM at 12-13. Instead, she would find that Strub made a binding election of rescission as her sole remedy by relinquishing her claim of specific performance in her post-trial brief, failing to object expressly in her post-trial motion to the trial court's election of rescission, and finalizing judgment of the court's restitution award. *Id.* at 12. Key to our learned colleague's interpretation is her assumption that Strub and the trial court use the terms "damages" and "restitution" interchangeably. *See id.* at 13. While the CDM extends the trial court grace by classifying this interchangeable use in its post-trial order as a mischaracterization that it later corrected, she narrowly construes Strub's post-trial motion and concludes that Strub failed to preserve the issue presented on appeal.

While we respect the CDM's position, and agree that more precision would have clarified multiple aspects of this case, we respectfully disagree that Strub elected rescission and restitution **to the exclusion of damages** at any point or that the trial necessarily misused the term damages until the time it corrected its mistake in its Rule 1925(a) opinion. The issue of whether a party elected a binding exclusive remedy is fact dependent, and our Rules of Civil Procedure do not prescribe a procedural mechanism for election. ***See***

*Gamesa*, 217 A.3d at 1240-41. We do not specify when Strub made a binding election of damages because the record does not reflect that she did. But we also do not find that it is necessary for us to accept this part of her argument to reach our disposition.

The certified record reveals that Strub consistently maintained her position that if she could not re-inspect the property and accept specific performance, she was entitled to damages for breach of contract, or alternatively, that she was entitled to rescind the contract and obtain restitution, whereas Wesol consistently insisted that there was no Agreement or breach and that damages were outside the scope of Strub's second count. In other words, Strub sought to keep her options open while Wesol sought to narrow them. Wesol did so only through argument, and the trial court never ordered Strub to make an election.

In fact, the record reflects that until the trial court issued its opinion, it did not expressly resolve the dispute over available remedies. In its June 6, 2024 order, the trial court rejected Strub's claims for damages based upon the speculative evidence presented, not because she only brought a claim for rescission (as Wesol had argued) or because she made a binding election of rescission during the litigation (as our learned colleague would find). *See* Trial Court Order, 6/6/2024, at 10-11. While it clearly rescinded the contract, it also clearly referred to an "assessment of monetary damages" and awarded

Strub reimbursement for fees she expended "in reliance on the Agreement."
*Id.* at 10.[6]

While we agree that Strub's post-trial motion challenging this order did not expressly object to the trial court's award of the equitable remedy of rescission, and such an objection would have helped clarify her argument, we respectfully disagree that she had to on pain of waiver of her right to elect her ultimate remedy at that point. Instead, the issue was implicit within her argument that the trial court erred in not awarding her the damages she claimed she pled in her complaint and proved at trial. After receiving these arguments, the trial court denied Strub's motion in parts relevant to this claim.

Strub praeciped to enter judgment on the monetary amounts that she had achieved, which was a necessary procedural step to filing an appeal challenging the court's failure to award all damages she claimed. In her concise statement of matters complained of an appeal, Strub continued to

---

[6] Adding to the confusion and ambiguity in this case is the potential overlap between restitution and certain damages. Restitution and damages are legally inapposite in general; in most cases, they are factually inapposite, too. But in a case involving a real estate transaction that does not close, there may be more overlap between remedies than in other situations. Whether a buyer is legally entitled to rescind the contract prior to closing because of a seller's bad faith, or is legally excused from buying the real estate on the closing date because the seller materially breaches the contract by not being able to deliver the property in the condition promised, restoring the buyer to the pre-contract position (restitution) or compensating the buyer for loss suffered due to the seller's bad faith act of refusing to convey the property (damages) may involve awarding amounts expended by the buyer in reliance upon the agreement's future closing date.

argue in the alternative that the court erred by: (1) denying inspection; (2) not awarding all of her claimed damages; and (3) not recognizing that the unawarded damages could alternatively be awarded as restitution. **See** Concise Statement, 11/26/2024, ¶¶ 1-3.

In its Rule 1925(a) opinion, the trial court defended its decision to deny damages based upon their speculative nature, but it also expressly addressed the limitation upon Strub's remedies for the first time: because Strub "sought the remedy of rescission of the Agreement," she "elect[ed] to disavow the real estate contract," which, by law, limited her available remedies and precluded her claim for compensatory damages. Trial Court Opinion, 1/21/2025, at 7-9. The trial court did not elaborate, making it unclear whether Strub's choice arose from the structure of her complaint (as Wesol argued) or whether it found **Umbelina** entirely prohibited Strub from maintaining inconsistent litigation positions. Regardless of why it added this rationale, given the interrelation between Strub's sub-arguments, the trial court's overruling of Wesol's evidentiary objections, its reference to damages in its June 6, 2024 order, and its express adoption of this rationale for the first time after the parties appealed, we decline to find Strub's argument waived.

<u>Strub's Appeal: Proof of Damages</u>

We turn now to the court's alternative rationale for rejecting Strub's requested damages—that they are speculative and not proven with sufficient definiteness and specificity. Strub argues that the trial court erred by failing

to award her (1) $203,000.00 in lost rental income based upon the lease Strub anticipated that the prospective tenants would sign; (2) $190,000.00 for the increase in the Property's value from the time she signed the Agreement until trial; and (3) $83,000.00 in unrealized value that she would have gained from subdividing the Property. Strub's Brief at 25-27. Strub insists that Wesol breached the Agreement without any justification or excuse. *Id.* at 23-25. From Strub's perspective, Wesol acted in bad faith by proceeding towards closing without disputing her obligations in the Added Terms, failing to complete such obligations, and then disavowing that she was ever so obligated when sued for breach. *Id.* Based upon Wesol's breach and bad faith behavior, Strub contends that she is entitled to $476,000.00 in damages to satisfy her expectation interest and to give her the benefit of the bargain. *Id.* at 22-30. Strub argues that she presented uncontroverted, specific, and definite evidence of these damages. *Id.* at 27-30.

In support of the lost rental income, Strub claims she provided "uncontradicted" evidence that she negotiated an agreement with a tenant whereby the tenant agreed to rent the Property for sixteen months, paying either fifty-five thousand subdivided each month or fifty-thousand dollars up front. Strub's Brief at 26-27. But for Wesol's breach of the Agreement, Strub argues, the tenants would have signed the rental contract. *Id.* This negotiated agreement, Strub contends, demonstrates the rental value of the

Property is $203,000.00 ($3,500.00 in lost rent each month from closing until trial) with an adequate amount of certainty. *Id.* at 27.

Next, Strub contends that she established the $190,000.00 increase in value through the expert testimony of John McChesney ("Appraiser McChesney"), a real estate appraiser Strub retained prior to closing to appraise the Property's value and the lost subdivision opportunity. *Id.* at 25-30. Appraiser McChesney opined that the fair market value of the Property was $800,000.00 at the time that she bid $700,000.00, proving that she would have realized $100,000.00 in gain upon closing. *Id.* at 26. Furthermore, the value of the Property increased by another $90,000.00 between the time of closing and trial. *Id.* She claims that the potential benefit of increased value is foreseeable in any real estate transaction, Wesol did not dispute the amount of the claimed damages, and the trial court did "not suggest the appraiser was not qualified, reliable and credible, or that his opinion was not well-supported." *Id.* at 27-28. Thus, she argues that she proved this consequential damage with adequate precision and the trial court's sua sponte speculation of how the Covid-19 pandemic affected real estate values lacks record support. *Id.* at 26, 29.

Finally, Strub contends she proved, through Appraiser McChesney's expert opinion, that she would have realized $83,000.00 in profit between closing and trial from subdividing the Property. *Id.* at 26-28, 30. These damages were foreseeable because Wesol was aware of her desire to

subdivide the Property. *Id.* at 26-27. To the extent that the trial court found the damages speculative, it should have admitted the testimony of Mitchell Jacobs ("Engineer Jacobs"), an engineer who conducted a feasibility study, who would have confirmed that the Property met requirements for subdivision. *Id.* at 30. Instead, the court sustained an objection preventing Engineer Jacobs from testifying and then claimed she lacked an adequate basis for the damages. *Id.*[7]

"Breach of contract damages are intended to place the non-breaching party nearly as possible in the same position it would have occupied had there been no breach." *Viniculum*, 310 A.3d at 249 (cleaned up). When a party breaches a contract without legal justification, unless the contract provides otherwise, a non-breaching party is entitled to recover damages to compensate it for the loss suffered. *Id.* Damages, however, must either "naturally and ordinarily result from the breach" or be "reasonably foreseeable" and within the parties' contemplation at the time they made the contract. *Id.* (cleaned up).

Additionally, the party seeking damages must be able to prove their existence with reasonable certainty. *Id.* A damages award must have a reasonable basis to support it and cannot be based on mere guesswork or

_____

[7] Wesol does not present specific arguments in response beyond her argument that Strub is not entitled to compensatory damages because she elected to rescind the Agreement. *See* Wesol's Brief at 40-45.

speculation. *Helpin v. Trs. of Univ. of Pennsylvania*, 10 A.3d 267, 270 (Pa. 2010). Nonetheless, because certain damages are inherently difficult to prove, a party cannot be denied compensation for a breach of contract merely because it cannot prove an exact amount of loss. *Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 22 A.2d 709 (Pa. 1941). Thus, a court may deny damages as "speculative only if the uncertainty concerns the fact of damages rather than the amount." *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 227 (Pa. Super. 1991) (citation omitted).

Absent equitable claims, in a breach of contract action based upon a seller's breach of contract to sell land, if the vendor has acted in good faith, the thwarted purchaser's recovery generally is limited to the down money, plus reasonable expenses incurred in reliance upon the contract. *Empire Props, Inc. v. Equireal, Inc.*, 674 A.2d 297, 304 (Pa. Super. 1996) (citation omitted). If a land seller "acts in bad faith in refusing to convey" land he agreed in writing to sell to another, however, "the purchaser's recovery is not limited to the purchase money paid, with interest and expenses"; instead, the purchaser "is entitled to compensation for his actual loss, or, as it is sometimes expressed, damages for the loss of his bargain." *Seidlek v. Bradley*, 142 A. 914, 916 (Pa. 1928). This includes "the money he might have derived from … completion" of the written agreement. *Id.*; *see also* Purchaser's damages, 25 Williston on Contracts § 66:81 (4th ed.) ("Generally, when the vendor under a contract for the sale of real estate wrongfully fails or refuses to

convey, the aggrieved purchaser may recover, as general damages for the breach, the difference between the contract price and the market value of the land, plus interest on that amount. This measure gives the purchaser the benefit of the bargain if the property is worth more than the contract price.") (footnotes omitted).

The failure to convey need not be fraudulent to constitute bad faith; "[a]ny unjustified failure to perform a written contract" to convey land "entitles the vendee to damages for the loss of his bargain." *Seidlek*, 142 A. at 915-16. A vendor may act in bad faith, for example, by entering into an agreement to sell land knowing that he was contractually obligated to sell it to another or that he did not own the land upon which the home was located. *See In re Craven's Est*., 82 A.2d 60, 63 (Pa. 1951); *Baldassari v. Baldassari*, 420 A.2d 556, 562 n.5 (Pa. Super. 1980). Bad faith also includes the refusal to comply with a contract to sell land "arbitrarily and without reasonable excuse, in order to escape the effects of a bad bargain." *Frey v. Nakles*, 112 A.2d 329, 332 (Pa. 1955); *see also Seidlek*, 142 A. at 916 (vendor acts in bad faith by willfully refusing to convey land or disabling himself from conveying land after entering written contract to sell it).

*Loss of Rental Income*

The trial court declined to award lost rental income, finding that Strub did not present "credible evidence" that a "binding rental agreement was in place or agreed to." Trial Court Opinion, 1/21/2025, at 8. The trial court

decided the evidence Strub presented of a proposed rental agreement was speculative because it was not "executed by a ready, willing and able tenant." *Id.* We agree that Strub's evidence of lost rental income was speculative: while Strub clearly desired to rent the Property following closing, she did not establish that Wesol's breach forced her to forgo an opportunity to rent the Property for $3,5000.00 per month.

Specifically, the record shows that Strub engaged Chant Realtors to list the Property for rent and obtain a tenant. *See* Strub's Exhibit 10 (10/29/2018 Rental Listing Agreement). Wesol gave permission to Chant Realtors to show the Property prior to closing for this purpose with advance notice. *See* Strub's Exhibit 11 (11/11/2018 Wesol Authorization). Agent Matolyak testified that she showed the Property to a prospective tenant prior to the scheduled closing, but she was unable to recall the date or how she notified Wesol of the showing as required by her authorization. N.T., 5/23/2023, at 77, 81, 101-02. According to Strub, she and the prospective tenants negotiated and agreed to the amount of rent for a sixteen-month arrangement, and she signed a lease prepared by Chant Realtors reflecting this agreement. N.T., 10/11/2022, at 83-88. The tenants, however, did not sign the agreement. *Id.* Agent Matolyak claimed that they were ready, willing, and able to rent the Property. *Id.* at 83, 86. Both she and Strub blamed their failure to sign the lease on Wesol's failure to make the repairs and close on the Property. *Id.*; *see* N.T., 10/11/2022, at 87 (testifying the prospective tenants' "living

arrangements were hanging in the balance" and she "was keeping them apprised hoping to keep them warm so we could close and sign the lease agreement").

The record reflects, however, that neither Strub nor Agent Matolyak explained why the tenants did not sign the lease upon its preparation. The proposed lease was expressly contingent upon closing of the prospective tenants' home as well as Strub's closing with Wesol, indicating that Strub contemplated the parties signing it in advance of the sale. *See id.* at 81-83, 86; *see also* Strub's Exhibit 12 (Proposed Residential Lease). As factfinder, the trial court was entitled to assess the credibility of Strub and Agent Matolyak and to weigh this evidence against the absence of a fully executed lease agreement or firsthand testimony from the tenants of their intent.

Furthermore, even if the trial court credited Strub's testimony that these tenants were willing to rent the Property on the terms she described, this does not establish with reasonable certainty that Strub had the opportunity to rent the Property continuously for $3,5000 from closing until trial. *See* Strub's Exhibit 9 (December 5, 2018 email from Agent Matolyak informing Strub that she was waiting for a written offer from prospective tenants who may want to rent in the area for one year and advising her that the price point may limit interest to "very few people"). As such, the trial court did not err by determining that Strub did not present reasonably certain evidence that she

lost rental income due to Wesol's breach of the Agreement. ***See Logan***, 600 A.2d at 227; ***Helpin***, 10 A.3d at 270.

*Increase in Value of the Property*

There are three categories of damages pertaining to increase in the value of the Property: (1) $100,000.00 of value Strub would have realized at closing by acquiring a property with a fair market value higher than she bid for it; (2) $90,000.00 of value Strub would have realized between closing and trial because of the increase in fair market value through market conditions; and (3) $83,000.00 of value that would have been generated from subdividing the Property.

Strub presented Appraiser McChesney's testimony in support of each subset of damages. The trial court permitted Appraiser McChesney to testify as an expert in the field of real estate appraisal over Wesol's objection, but it expressly limited his testimony to the fair market value of the Property around the time of the closing contemplated by the Agreement. N.T., 5/23/2023, at 142, 47, 49, 52. To that end, Appraiser McChesney opined that the Property's fair market value on October 28, 2018, was $800,000.00, which was $100,000.00 more than Strub agreed to pay for it at auction. ***Id.*** at 159. In arriving at that opinion, Appraiser McChesney considered three sales of comparable homes in 2018 and adjusted his analysis for various factors, such as location and condition. ***Id.*** at 154-59. His estimated value accounted for the mold issues identified in Inspector Smetaniuk's report, but it did assume

that the heating and plumbing systems were functional. *Id.* at 160-61, 64-67, 69.

In his appraisal report, Appraiser McChesney opined that the Property was worth $890,000.00 around the time of trial (specifically, on February 3, 2023). *See* Strub's Exhibit 13 (Appraisal Report). He also opined that if Strub had subdivided the Property, an additional lot would be worth $83,000 at the time of trial. *Id.* He did not testify in support of either of these opinions, however, because of the aforementioned restriction on the scope of his testimony. While he was on the stand, Strub identified, but did not seek to admit, Appraiser McChesney's appraisal report. N.T., 5/23/2023, at 144. Instead, before she rested, Strub sought to admit the report in batch along with her other thirteen exhibits. *Id.* at 170-74. Wesol indicated the exhibits to which she had an objection and Strub responded briefly. *Id.* Neither Wesol nor Strub elaborated upon their bases for objection or admission of the appraisal report, and the trial court admitted it without further comment. *See id.* at 172-74.

Strub also presented the testimony of Engineer Jacobs to support her damages claims. Over Wesol's objection, Engineer Jacobs testified as an expert in professional engineering, establishing that his firm performed a boundary survey and feasibility study exploring whether Strub's intended uses for the Property were feasible pursuant to the features of the Property and applicable municipal ordinances, for which they charged $5,700.00 in fees.

When he began to elaborate upon his conclusions from the study, however, the trial court sustained Wesol's objection, ruling that Strub failed to plead in her complaint any basis for consequential damages flowing from Wesol's breach in the form of lost development opportunity. N.T., 5/23/2023, at 125-26; *see also* Pa.R.C.P. 1019(f) ("Averments of time, place and items of special damage shall be specifically stated.").

Although Strub alludes to evidentiary error in her brief, she did not challenge the trial court's exercise of its discretion to limit the scope of Appraiser McChesney's testimony by raising this evidentiary issue in her concise statement or her statement of questions involved. As such, based upon the record, Strub simply failed to prove that the Property's market value increased by $90,000.00 post-closing or that it would have increased by an additional $83,000.00 had she subdivided it post-closing. We reject Strub's argument that the court silently changed course regarding its earlier evidentiary ruling by permitting Strub to offer, through his report alone, the appraiser's opinion regarding increases to the Property's value beyond the time of auction. *See* Strub's Brief at 15, 26. Mindful that the court was considering a batch of exhibits in a non-jury trial after it clearly had limited the scope of Appraiser McChesney's testimony on the stand, we have no reason to believe that the court intended to consider the report beyond the scope of its earlier ruling.

Similarly, Strub did not challenge the trial court's exercise of its discretion to deny admission of Engineer Jacob's opinions about the feasibility of subdividing the Property. Without the feasibility study, Appraiser McChesney's estimation of $83,000 in lost development opportunity lacked foundation, and Strub failed to establish by a preponderance of the evidence that it was reasonably certain that she had, and then lost, the opportunity to subdivide the Property.

This leaves the lost benefit of acquiring a property worth $100,000.00 more than her bid. The court explained that it rejected this claim of damages because the valuation Strub offered regarding the Property was based upon pre- and post-pandemic values, and, as a fact of common knowledge, Covid-19 affected real estate values throughout the country. Trial Court Opinion, 1/21/2025, at 8-9. Given "the condition of this specific property, the numerous unrepaired construction items[,] and the ever[-]uncertain real estate market, especially post-Covid," the court determined that her claim for loss of the benefit of the bargain of $100,000.00 was speculative. ***Id.***

We are perplexed by the trial court's rationale, as it seems to be at odds with the record or possibly premised upon a misunderstanding of what Strub seeks. Appraiser McChesney's $800,000.00 estimate looked at the Property's fair market value during a snapshot in time, prior to the Covid-19 pandemic. He arrived at the figure by comparing the Property to three comparable houses sold in late 2017 and early 2018—around the time of Strub's successful bid on

the Property—thus comparing proverbial apples to apples. Likewise, Appraiser McChesney explained which aspects of the Property's condition that he considered when arriving at his estimate. The $100,000.00 represented the value of the money Strub might have derived from the completion of the Agreement. *See Seidlek*, 142 A. at 916. Because the Property's 2018 market value was higher than the contract price the parties agreed upon, Strub sought to recover the difference to compensate her for losing this benefit when Wesol breached the Agreement. We fail to understand how a post-breach disruption to the real estate market rendered speculative Strub's evidence of the pre-pandemic value of the Property. While the intervening global pandemic and the home's unrepaired condition may have impacted any comparison between Strub's bid in 2018 and the Property's estimated value five years later at trial, such factors have no bearing upon the analysis of whether Strub proved, with adequate certainty, damages regarding her lost bargain pre-pandemic. Because the trial court denied the damages based upon the speculative nature, it did not analyze whether Wesol acted in bad faith in refusing to convey the Property to Strub. *See Seidlek*, 142 A. at 916. As such, we remand on this issue to allow it to make this determination in the first instance.

*Auctioneer's Fee*

Strub argues that Wesol should be obligated to award her damages by reimbursing her for Auctioneer Regan's $35,000 fee. Strub's Brief at 33.

Strub does not contest the trial court's ruling that Auctioneer Regan earned his fee per the terms of the auction, but she claims that Wesol should have to pay the fee as a result of her breach or to prevent her from being unjustly enriched. *Id.*

Strub's argument regarding unjust enrichment is a non-starter; she only brought an unjust enrichment claim against Auctioneer Regan, not Wesol. Further, although she did seek from Wesol the $35,000.00 as damages, we agree with the trial court that Strub did not prove her entitlement to recover these fees from Wesol. Auctioneer Regan explained that the terms of the auction included paying a fee to him of 5% of the winning bid on the day of the auction; by participating in the auction and submitting the winning bid, Strub agreed to pay Auctioneer Regan this fee; and by performing the auction, Auctioneer Regan earned his fee regardless of whether the Property closed. Strub's verbal contract to pay Auctioneer Regan a 5% fee on the day of the auction predated, and was independent from, Strub's Agreement with Wesol. The damages are not compensatory—Strub is still in the same position she would have occupied if there had been no breach. *See Empire Props.,* 674 A.2d at 304 ("The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach."). Nor would it compensate Strub for her loss of the benefit of the bargain, as the fee is not money derived from completion of the agreement. *See Seidlek*, 142 A. at 916. As such, no relief is due regarding the auctioneer fee.

<u>Wesol's Cross Appeal: Award of Inspection and Survey Fees</u>

The last remaining issue pertaining to damages is Wesol's claim of error regarding the award of inspection and surveying fees to Strub. Wesol's Brief at 61-63. Wesol argues that Strub incurred the survey and inspection fees at her own risk after she signed the Agreement, which specified that the sale was "as is" with no inspections. *Id.* at 62. Wesol argues that awarding such fees is incompatible with rescission and inequitable. *Id.* at 62-63 (citing **Umbelina**, 34 A.3d at 151).

We already have determined in Strub's appeal that the trial court erred by prematurely and unilaterally electing rescission on Strub's behalf. *See* *supra* at 25-30. Moreover, to the extent the Agreement precluded inspections, Wesol agreed to Strub's request to inspect the Property. *See* N.T., 8/15/2023, at 157-58; *see also Empire Prop.*, 674 A.2d at 302-03 (parties may modify agreement of sale by mutually assenting to a change). As such, the trial court did not err by awarding $5,700.00 for surveying fees and $2,800.00 for inspection fees as compensatory damages, and no relief is due based upon the argument presented on appeal.

**Strub's Appeal: Denial of Motion to Inspect Property**

In the alternative, Strub argues that if we do not grant her relief regarding her damages claims, we should reverse and remand for a new trial on remedies only after allowing Strub an opportunity to inspect the Property and to elect between specific performance and damages. Strub's Brief at 33-

35.[8] Strub claims that she is entitled to such relief because the trial court did not apply reasoned discretion in denying her motion to inspect the Property in August 2022 prior to trial when the trial was over a month away, she did not know the condition of the Property, and the standard for discovery is liberal. *Id.* at 34-35.

The Rules of Civil Procedure permit a party to inspect property in the possession or control of another party for the purpose of inspecting and measuring, surveying, photographing, testing, or sampling the property. Pa.R.Civ.P. 4009.31. The party seeking inspection may enter the property "one or more times to accomplish" the requested activities. *Id.* 4009.32(c). The party must serve a motion upon the other party at any time after service, describing with reasonable particularity the property to be entered and the activities to be performed. *Id.* 4009.32(a). The responding party must allow the requested entry or object with stated reasons within thirty days. *Id.* 4009.32(b). If the responding party objects, fails to respond, or refuses entry, the requesting party may move for an order under Rule 4019(a). *Id.*

Generally, the rules "provide no timetable for discovery; rather, the parties are permitted to engage in the various types of discovery simultaneously, subject to the supervision of the trial court." *Kerns v.*

_____

[8] Although we have granted Strub some relief regarding her claim for damages, we address this claim because we do not reverse the trial court's decision on damages in its entirety.

*Methodist Hosp.*, 574 A.2d 1068, 1073 (Pa. Super. 1990). "In supervising discovery, the trial court has broad discretion to take such action as it deems appropriate to insure prompt and adequate discovery." *Id.*

Upon review, we discern no abuse of discretion by the trial court. In October 2020, Strub moved to strike Wesol's certificate of trial readiness, contending that discovery was outstanding. Motion to Strike from Trial List, 10/16/2020, ¶¶ 15, 23. Almost a year later, Strub withdrew her motion to strike, asserting that the parties had completed depositions and the case was ready for trial. Motion to Withdraw Motion to Strike, 9/21/2021, ¶ 6. On July 20, 2022, the trial court entered an order scheduling the case for trial in October 2022.

On September 1, 2022, Strub moved to compel entry upon the Property for the purpose of conducting an updated inspection, citing Wesol's refusal to permit her on the Property, overgrowth and deterioration of the Property observed from the street, and her need to inspect the Property's condition after the passage of almost four years from her pre-closing inspection "in preparation for the impending trial" and "in connection with instant suit for specific performance." Motion to Compel Entry, 9/1/2022, ¶¶ 6-8. Strub averred that she sought and was denied entry on the Property in July 2021 and again in August 2022. *Id.* at ¶¶ 4-7. Wesol filed an answer objecting to Strub's request for an inspection, arguing that the Property's condition was irrelevant and the request was untimely. Answer to Motion to Compel Entry

Upon Property, 9/19/2022, ¶ 8. Auctioneer Regan joined the objection. Following a hearing on September 27, 2025,[9] the trial court entered an order denying the motion on October 5, 2022. In its Rule 1925(a) opinion, the trial court explained that it denied Strub's request because she did not avail herself of the opportunity to inspect the Property over three and a half years, sought to inspect the Property approximately one month before trial, and failed to explain how it would advance her claim of specific performance. Trial Court Opinion, 1/21/2025, at 7.

Based upon the parties' arguments and the information we have in the certified record, the trial court's denial of Strub's motion was within its discretion to manage the timing of discovery and trial. Strub fails to articulate on appeal (or in her motion) why she did not file a motion to compel the inspection and agreed that the case was ready to proceed to trial several weeks after Wesol's first denial, why she waited until the month prior to trial to file a motion to compel the inspection, what she proposed to do if given access to the Property, or how accessing the Property connected to her claim of specific performance. Given the trial court's broad discretion to manage discovery, we do not disturb the exercise of its discretion here. *See Kerns*, 574 A.2d at 1073.

**Conclusion**

_____

[9] No hearing transcript appears in the certified record and neither the trial court nor either of the parties explain what transpired at the hearing.

Following our comprehensive review, we affirm the trial court's finding that Strub's Added Terms became part of the Agreement and that Wesol breached the Agreement. We further conclude that the trial court erred by electing rescission as Strub's remedy for Wesol's breach. We do not disturb the trial court's decision not to award damages for lost rent, increased Property value from closing until trial, loss of subdivision opportunity, or Auctioneer Regan's fee. We also do not disturb its damage award for inspection and engineering fees incurred by Strub. Because the trial court erred by concluding that Strub's evidence in support of $100,000.00 in benefit of the bargain damages were speculative, we remand for the trial court to determine whether Strub established that Wesol acted in bad faith in refusing to convey the Property to Strub, thereby entitling Strub to $100,000.00 in benefit of the bargain damages. Finally, the trial court did not abuse its discretion by denying Strub's motion to inspect the Property prior to trial.

Judgment affirmed in part and vacated in part. Remand for further proceedings consistent with this decision. Jurisdiction relinquished.

Judge Murray joins the memorandum.

Judge Bowes files a concurring and dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/23/2026</u>